# PERETH COHEN *vs.* FRANK HERBERT.

*Negligence—Open Elevator Shaft—Contributory Negligence—
Directed Verdict—Amendment—Making New Party.*

In an action by a contractor employed to make alterations in
the interior of a building, against the owners of the building
and a lessee of part thereof, for injuries received as a result
of his fall down an elevator shaft, into which he stepped under
the impression that he was passing from one hallway into
another, *held* that a directed verdict for the owners was proper,
but that there was evidence sufficient to go to the jury of negli-
gence on the part of the lessee's employee in leaving open the
door leading to the elevator shaft.                    pp. 203, 204

Error in refusing to direct a verdict for the defendant is
waived by his subsequent offer of evidence.                    p. 203

That one of defendants was not an original party, but was,
by an amendment of the declaration, made a joint defendant
with the two original defendants, and that subsequently a ver-
dict was directed in favor of these latter, did not involve the
making of an entirely new party defendant, by amendment, in
violation of Code, art. 75, sec. 41.                    pp. 203, 204

A prayer by defendant that under the pleadings and evi-
dence no legally sufficient evidence has been offered to justify
a verdict for plaintiff, is, under Code, art. 5, sec. 9A, too gen-
eral for the purpose of raising the question of variance between
the pleading and the proof.                    p. 205

The court should not instruct the jury that, in spite of de-
fendant's negligence, plaintiff cannot recover, unless the case
presents some prominent and decisive act, in regard to the effect
and character of which no room is left for ordinary minds to
differ.                    p. 205

In determining whether plaintiff was guilty of contributory
negligence, his acts and conduct are to be considered in connec-
tion with all the facts and circumstances associated therewith,
and unless such acts and conduct, when so considered, present

some such feature of recklessness as would leave no opportunity for difference of opinion in the minds of ordinarily prudent persons as to the imprudence of such acts and conduct, the court is not justified in saying that plaintiff is as a matter of law guilty of contributory negligence.        p. 206

Plaintiff, a contractor employed to make alterations in the interior of a building, appearing, though he had previously been in the building, never to have been in the hallway from which he fell into an open elevator shaft, he testifying that he mistook the open door of the shaft for the entrance into another hallway, through which he had passed on a previous occasion, and the hallway appearing to have been not well lighted, *held* that the question of plaintiff's contributory negligence was properly submitted to the court sitting as a jury.     pp. 206, 207

*Decided February 14th, 1924.*

Appeal from the Superior Court of Baltimore City (GORTER, C. J.).

Action by Frank Herbert against Pereth Cohen, trading as the Eagle Underwear Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Defendant's second prayer was as follows: "The defendant, Pereth Cohen, prays the court to rule as a matter of law that under the pleadings and evidence in the case no legally sufficient evidence has been offered to justify a verdict for the plaintiff against him, and that the verdict must therefore be in his favor."

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Edgar Allan Poe* and *Paul R. Kach,* for the appellant.

*Rowland K. Adams,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

In this case an action was brought by the appellee, Frank Herbert, against Aaron Cohen and Michael Hartz, owners of the premises known as 322 West Baltimore Street, in the City of Baltimore, and the appellant, Pereth Cohen, trading as Eagle Underwear Company, lessee of a portion of said premises, for injuries sustained by the plaintiff in falling down an elevator shaft, from the first floor to the bottom of the elevator pit, in the rear of said premises, caused, as claimed by the appellee, by the negligence of the defendants.

The accident happened on the eighth day of September, 1921, and the building in which it occurred, a five-story structure, fronting on Baltimore Street, a few doors east of Eutaw Street, and extending back to Garrett Street, was at the time owned by said Aaron Cohen and Michael Hartz, with a tenant occuping each of its floors.

The Brockton Shoe Company occupied the first floor, with the exception of a space seventeen feet by twenty feet in the northwest corner of the building, in which there were a hallway, storage room and elevator shaft. This place, it seems, was for the joint use of all the tenants of the building, including the tenant on the first floor, except the elevator, which was for the joint use of the tenants of the upper floors, it not being needed by the tenant of the first floor. The tenants of the upper floors were each required to pay one-fourth of the cost of the current consumed in its operation, and each of these furnished his own operator and used the elevator, as he needed it, in getting his merchandise to and from the floor occupied by him.

There is an entrance to the hallway, as well as to the store room, from Garrett Street. The entrance to the hallway is spoken of as the west entrance, and the entrance to the store room, also called a hallway, is referred to as the east entrance. There are double doors at the entrance to the west hallway, which hallway extends towards the south thirteen feet, and at its extreme southern end, and to the right of it, is the elevator shaft, and across the hallway from the shaft, at a distance of five and one-half feet, and immediately in

front of it, is a door leading from the east hallway, and at the end of the west hallway, immediately facing the entrance thereto, is a door leading into another hallway, which leads westerly to the hallway at the extreme west of the building, which extends southward to the storeroom in the rear of the premises occupied by the shoe company.

In 1921, the appellee, a builder and contractor, was employed by the Brockton Shoe Company to alter the storeroom occupied by it on the first floor of the premises mentioned. The alterations consisted of changing the front of the store, putting in two front entrances, dividing the store into two parts by a longitudinal partition, and putting a cross partition in the rear of the store. The appellee started to make these alterations about August 20th, 1921, and about September 1st, 1921, Benjamin Schultz met the appellee upon the premises, 322 West Baltimore Street, to contract with him for the plaster work. Because of the great traffic upon Baltimore Street, it was decided that the plastering materials should be stored and mixed in Garrett Street, in the rear of the building, and carried from that point, through the hallways mentioned, to the front of the building. To this end the appellee and Schultz walked from the front of the building, where they were then talking, through the hallway leading therefrom towards the west entrance on Garrett Street, stopping in the open doorway at the south end of the west hallway, and from that point the appellee showed Schultz the west entrance. The double doors were then open, and Schultz was directed to carry the mortar through that entrance to the front of the building by the use of said hallways.

At that time the solid panel door to the elevator shaft, only a few inches from the door in which they stood, was down, and the appellee observed not only this door, but also a smaller panel door on the same side of the hallway, nearer to the entrance, both of which were closed, but he did not know that either of these doors was in front of an elevator shaft, nor did he know there was an elevator shaft located in that part of the building. About a year previous the ap-

pellee had made some alterations to the same floor of the building, and was at work there for a period of several weeks, but at that time the materials used by him were all brought in through the front of the store, and he had no occasion to familiarize himself with the rear arrangement of the premises; and it was not until he started the work in 1921 that he had any familiarity at all with the rear parts of the building. As we gather from the record, only once, or possibly twice, before the occasion mentioned, had the appellee passed through these hallways leading from the front to the rear of the building, which was the extent of his knowedge as to them.

The appellee, who was expecting the plasterers to be at the building on the morning of the 8th day of September, 1921, to go to work, went directly to the rear of the building on Garrett Street, where he had directed the plastering materials to be stored and mixed, without passing through the building from front to rear, and when he arrived there, about 9 o'clock in the morning, he found the laborers were at work, carrying mortar to the front of the building through the west entrance. While talking with them Mr. Schultz and his son came out of the east entrance. Schultz said to him, "You had better get out of the way, for they (referring to the hodcarriers) will mess you up." He then stepped through the east entrance into the east hallway, and there engaged in a conversation with Mr. Schultz and his son. He said to Mr. Schultz, "How about material?" and Schultz said, "You had better go and telephone for sand," whereupon the appellee said, "All right, I am going in and call up." He then turned and walked southward in the east hallway to the door on the right leading into the west hallway, and, as he testified, "I walked in this hallway (meaning the west hallway) and, seeing this opening and knowing something about the outlines of the building, I thought this was going into the hallway (meaning the hallway beyond), and as I walked in there I dropped into space and went down." As he stated, it was not until he "was down in the basement, down in that pit" that he knew there was an elevator in that part of the

building. He was then asked, "When you went into the cor-
ridor what light, if any, was there in the hallway?" He said,
"There was no artificial light, just a light that came from the
western end side door," and at the time the hodcarriers were
walking in and out of the doors. He was then asked if there
was any safety gate, to which he replied, "No, sir, I surely
did not lift it up; I did not want to get killed or commit
suicide." He also testified that he had never before at-
tempted to go to the front of the building through its en-
trance on Garrett Street.

The east hallway, as we have said, was immediately to the
east of the west hallway, and one going through it to the front
of the building went only a few feet southward in it before
he was required to pass through a door on the right, in the
partition dividing the east from the west hallway, which led
into the west hallway. This door was immediately opposite
the elevator shaft, five and one-half feet away, and immedi-
ately to his left was the door at the south end of the west
hallway, the one in which the appellee stood on the occasion
when he pointed out to Schultz the west entrance upon Gar-
rett Street, through which he was to carry the mortar to the
front of the building, and it was this door through which
the appellee should have passed in entering the hallway that
led to the one on the west side of the building, through which
he would have passed in going to the front of the building,
but it seems that he took the open shaft of the elevator for
the open door, though, to have passed through that door, he
would have had to turn to his left, after entering the west
hallway. He was asked, "Didn't it occur to you that you
should first go southeast before you made that right turn?"
Answer, "If I had been more familiar with it—I had enough
ideas of the general outlines of the building to know there
was an elevator in the front, but I did not know there was
one in the back; it threw me off my guard completely." He
was asked by the court, "Then you turned off that hall and
kept straight on?" Answer, "I turned and went right into
the elevator." Question, "And you forgot all about, before
you did that, that you should have gone southeast?" An-

swer, "There was not that much time to think. You certainly looked for certain protections."

Upon cross-examination he was asked if he could not "tell that an elevator shaft is an elevator shaft unless the door is down?" Answer, "If I stand there for any length of time, sure I could see it, but I walked across there and I thought I was hitting this hallway here (indicating); that is, I walked right straight through." He further testified that it was dark in the shaft, and he could not see that it was a shaft and there was nothing there to warn him of that fact. "You did not know what it was, did you?" Answer, "Of course not, as far as knowing what it was; I thought it was just this hallway."

Evidence as to the darkness of the hallway at the point where the accident occurred was conflicting, and it was also conflicting as to the weather conditions. By some of the witnesses it was said that it was a "right bright day," by others, that "it was not a bright, sunshiny day," and by some it was said that the weather was cloudy, though the weather report had it fair and clear. The west hall, on the side of which was located the elevator shaft, was chiefly lighted through the doorway on Garrett Street, though some light, no doubt, was admitted through the open door in the partition between the hallways, and possibly some light might have shone through the door at the south end of the said hallway, but at the time of the accident, as was testified by the appellee, the hodcarriers were going in and out the entrance door thereto, and the light from the doors did not shine directly upon the shaft. It is, therefore, difficult to say to what extent the hallway was lighted. It is clearly shown from the evidence that the shaft was open and unguarded at the time of the accident. Both the panel door and the slat door, which is more often referred to in the evidence as the gate, were up at the time, with nothing to guard the open shaft.

On the morning of the 8th of September, a number of boxes of materials or merchandise, consigned to the appellant, Pereth Cohen, the tenant of the second floor of the building, were left at the Garrett Street entrance thereto. These

boxes were placed upon the elevator and were carried to the second floor by one Preisinger, an employee of Pereth Cohen.

Schultz and son, who reached the premises about 7.30 o'clock on the morning of that day, testified that they several times passed through the building from front to rear and from rear to front, while their men, the hod-carriers, were carrying the plaster into the building through the rear entrance; that in going from front to rear they could observe the location of the elevator shaft and could see whether the door or gate thereto was up or down, but, in entering the building from the rear, it was difficult to observe the shaft or elevator. This was due, as they said, to the way in which the light shone, or was reflected, in the hallway. They both stated that in passing through the hallway they saw the elevator door and gate up; and at one time, when Preisinger was about to ascend with the elevator, the elder Schultz told him to close the elevator door. In reply thereto Preisinger said, "Go to hell and tend to your own business"; and he ascended with the elevator without closing its door or gate. It was only a short time thereafter, a few minutes only, that the accident happened; and after it occurred Preisinger was seen running up the alley.

It was admitted by Preisinger that he made several trips in the elevator, in carrying goods to the second floor, but denied having any conversation with Schultz, or that he left the gate up, and stated that, when it was learned that the appellee had fallen into the shaft, the elevator was at one of the upper floors, and not at the second floor where he had left it, though no other person had been seen to use the elevator on that morning.

The case was tried by the court sitting as a jury, and at the conclusion of the plaintiff's testimony the defendants Aaron Cohen and Michael Hartz, owners of the premises, offered a prayer, which was granted, by which the court ruled as a matter of law that there was no evidence legally sufficient to entitle the plaintiff to recover against them, and a verdict was rendered in their favor. A similar prayer was offered by the defendant Pereth Cohen, but was refused by

the court. The said defendant also asked the court to rule as a matter of law that it appeared from the uncontradicted evidence that the plaintiff was guilty of contributory negligence, and asked that a verdict be directed in his favor. This prayer was likewise refused by the court. Pereth Cohen thereupon excepted to the rulings of the court in granting the prayer of Aaron Cohen and Michael Hartz, and in refusing to grant his first and second prayers. In addition thereto he filed his written motion by which the court was asked to dismiss the suit against him, "for the reason that suit was filed herein on the 6th day of April, 1922, against Aaron Cohen and Michael Hartz, and he was not included herein until made a party defendant by the plaintiff in his amended declaration filed August 12, 1922; that judgment has been rendered in favor of said defendants, Aaron Cohen and Michael Hartz, and the plaintiff is now attempting to proceed in the same suit against an entirely new party defendant." The court overruled this motion, and an exception was taken thereto.

Thereafter the defendant, Pereth Cohen, proceeded with the trial of the case by producing evidence in his own behalf, and at the conclusion thereof he offered eight prayers, all of which were rejected, except the fifth and seventh. The plaintiff asked for no instructions.

The rulings of the court in rejecting the defendants first, second, third, fourth, sixth and eighth prayers formed the third exception.

The court was correct in its rulings in granting the prayer of Aaron Cohen and Michael Hartz, and if it committed an error in its rulings upon the defendant's prayers, such error was waived when the defendant offered evidence in his behalf, after the rejection of those prayers. *Krymski* v. *Kupidlowski,* 139 Md. 656, and other cases. And so far as disclosed by the record, we find no evidence tending to show liability on the part of Aaron Cohen and Michael Hartz for the injuries sustained by the plaintiff.

There was likewise no error in the court's action in overruling the defendant's motion to dismiss the suit. It is true

that, in the action as originally brought, Pereth Cohen was not a party thereto, but, by leave of court, the declaration was amended and he was made a party defendant to the action with Aaron Cohen and Michael Hartz. The amendment so made was strictly within the provisions of the Code (article 75) as to amendments. The only effect of the amendment was to add another defendant, and thereafter the trial proceeded against all of the defendants in the same manner and with the same effect as if they had all been originally made defendants to the action, and afterwards no further amendments were made, or sought to be made. The dropping of Aaron Cohen and Michael Hartz as defendants was not the result of an amendment, but was in consequence of the action of the court in holding that there was no evidence legally sufficient to be considered by it, sitting as a jury, tending to show negligence on their part resulting in the in-injury or loss complained of.

The first prayer of the defendant, Pereth Cohen, asked the court to rule as a matter of law that there was no legally sufficient evidence offered to justify a verdict for the plaintiff against him.

The Brockton Shoe Company, tenant of the first floor of the building in which the accident occurred, had, under the terms of its rental, the right to use, with the tenants of the upper floors, the rear entrances of the building on Garrett Street and the hallways which led therefrom to the store-room leased by the Brockton Shoe Company. The right to use these hallways extended to all persons employed by the shoe company, as well as to the plaintiff, who, under his contract with the shoe company, was to make certain alterations in its storeroom, and to make those alterations it was necessary to carry certain materials to be used therein through such hallways. In the enjoyment of that right it was the duty of the defendant, his servants and agents, to operate the elevator, when used by him, with reasonable care, so as to avoid injury and damage to the plaintiff while using the hallways and in the use of them the plaintiff had a right to as-

sume that such duty would be faithfully performed by the defendant. *People's Bank* v. *Morgolofski,* 75 Md. 432.

There was, we think, beyond all doubt, evidence legally sufficient to be considered by the court, sitting as a jury, tending to show that the defendant, or his agents or servants, failed to perform the duty which it owed the plaintiff in the operation of the elevator, and, therefore, in our opinion, the court in the rejection of the defendant's first prayer committed no error.

The defendant's second prayer, which raised the question of variance between the pleading and the proof, is too general in respect thereto. Code, art. 5, sec. 9A; *Balto. & O. R. R. Co.* v. *Walsh,* 142 Md. 230, 237.

The court was asked by the third and eighth prayers of the defendant, Pereth Cohen, to rule as a matter of law that the plaintiff was guilty of negligence directly contributing to the accident. These prayers were refused by the court, and, we think, properly so.

It was said in *People's Bank* v. *Morgolofski, supra,* "Ordinarily, of course, the question of negligence is one for the jury, but sometimes it becomes the duty of the court to instruct them that, in spite of the negligence of the defendant, the plaintiff cannot recover. The court, however, will never assume this responsibility unless the case is a very clear one, and presents, as was said in *R. R. Co.* v. *Maugans,* 61 Md. 53, and others decided by this Court, some prominent and decisive act in regard to the effect and character of which no room is left for ordinary minds to differ."

In the later case of *Waltring* v. *James,* 136 Md. 413, it is said that "unless the act and conduct of the plaintiff relied on as amounting in law to contributory negligence is established by clear and uncontradicted evidence, the case should not be withdrawn from the jury, and that when the nature of the act relied on to show contributory negligence can only be determined by all the circumstances attending the transaction it is within the province of the jury to characterize it." *Cooke* v. *Baltimore Traction Co.,* 80 Md. 551.

. In determining whether the plaintiff in this case was guilty of contributory negligence, we are to consider his acts and conduct in connection with all the facts and circumstances associated therewith, and, unless we find that such acts and conduct, when so considered, present some such feature of recklessness as would leave no opportunity for difference of opinion in the minds of ordinarily prudent persons as to the imprudence of such acts and conduct, the court is not justified in saying that the plaintiff is as a matter of law guilty of contributory negligence.

The plaintiff had on one, if not on two, occasions gone from the front of the building to its west rear entrance on Garrett Street through the west hallway mentioned, or at least had gone within a few feet of that entrance, but, as the record discloses, he had never passed through said hallway from the rear entrance to the front of the building, nor is it shown from the record that he had ever been in the east hallway prior to the occasion of the accident.

It was through the east hallway that he, on the day of the accident, attempted to pass from the rear to the front of the building. It, as we have said, led into the west hallway, and to enter the latter the plaintiff had to turn to the right, passing through the door in the partition dividing the hallways, and when he had done so he was immediately in front of the elevator shaft, which was at the time open and only five and one-half feet away. In going from the last-named door toward the shaft, he was proceeding in the same direction as he would have gone had he entered the hall beyond, running at right angles with the west hallway. In his statement he says when he passed through the door in the partition dividing the hallways he mistook the open shaft, because of its darkness within, for the hallway beyond, which he thought he had entered, and in which it was necessary for him to have gone in reaching the front of the building occupied by the shoe company. In speaking of the light in the west hallway, he said there was no artificial light therein, and it appears that it was not well lighted, partially due, probably, to the fact that the hod-carriers were at the time

passing in and out of the rear entrance, as stated by him, thereby excluding, more or less, the light from the entrance. It will also be borne in mind that Schultz testified that objects in the west hallway, including the elevator shaft, could be much more readily seen in passing from front to rear than from rear to front. The plaintiff, as it will be recalled, had observed the west hallway while standing with Schultz in the door at its east end and saw the panel door immediately to his left, which was down at the time, though he did not recognize it as a door to an elevator shaft, nor did he know that a shaft was in that location. His inability to see objects in the hallway was probably caused in part by the fact, as explained by Schultz, that the hallway was not so well lighted to one passing from the rear to the front as it was to one passing from the front to the rear, which fact was not known to the plaintiff, as he had never before passed through the hallway from the rear.

While we may be impressed with what may seem to have been the negligence of the plaintiff, growing out of his acts and conduct, yet it cannot, we think, be correctly said that no doubt exists in respect thereto. Therefore, the question of his negligence was properly submitted to the court, sitting as a jury.

The only remaining rejected prayers of the defendant are the fourth and sixth prayers. These prayers, which we will not further discuss because of what we have already said applicable thereto, were, we think, properly refused.

Therefore, as we find no error in the rulings of the court, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*