MATTHEW WILLIAMS *v.* STATE, Use of Helen Pauline Ellis et al.

[No. 20, April Term, 1931.]

40

*Decided June 11th, 1931.*

Appeal from the Circuit Court for Charles County (DIGGES, C. J., LOKER and MATTINGLY, JJ.).

The cause was argued before URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Clater W. Smith* and *Walter L. Clark,* with whom was *Walter J. Mitchell* on the brief, for the appellant.

*John F. Mudd,* with whom was *J. Read Bailey* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

There is only one question in this case, but, as that is to the legal sufficiency of the evidence to support the verdict, and as the evidence tending to prove the negligence of the defendant and its causal connection with the death of plaintiff's decedent is wholly circumstantial, it is necessary to review all the facts with some particularity.

James P. Drury resided, with two daughters, on a small farm situate on the north side of the state road in St. Mary's County, a little less than half a mile from Mechanicsville. On the evening of January 3rd, 1929, he was at Mechanicsville. Wilson Fairall testified that he saw him there about 7 o'clock and talked to him. "After that time I seen him when he went on up the road. He lived a little less than half a

mile up the road, north of Mechanicsville, in the direction of Charlotte Hall. I saw him just as he started up the road; it was then between seven-thirty and eight o'clock. A colored boy was with him. * * * I would say he is crazy (it was stated at the argument that the colored boy was an idiot and could not be used as a witness), and he was in company with · Mr. Drury when I saw him going up the road, that was between seven-thirty and eight o'clock." He testified then to finding a man lying off the north side of the state road about twenty feet from the road into the Drury home. This was between 8 and 8.30. He did not recognize him, and went back to Mechanicsville for help. He went to Robert S. Burroughs, a justice of the peace, and they, with Stanley Williams, a nephew of Mr. Drury, went to the scene of the accident. It was then that Mr. Drury was recognized, first by his nephew. Mr. Drury was lying seven or eight feet to the right of the east edge of the concrete part of the road, and between twenty or twenty-one feet south of the road leading into his home.

Dr. Johnson, the physician who was sent for by Squire Burroughs, said Mr. Drury had been removed to his home when he arrived and found him unconscious, and he so continued until he died on January 4th. He found the skull fractured near the crown. He did not recall "any other wound on the body, nothing serious." "The cut on the scalp was * * * about three inches across, * * * but the depression in the skull where the bones were fractured did not seem to be over about one inch, as if the centre of the blow, the force of the blow, had been at one particular spot, and the bone was depressed, as I recall, about one-eighth of an inch, the bone was pressed into the brain * * * I think there were several smaller clean cut wounds like glass, or something like that. There were some cuts there as if it was made by glass, I did not find any glass. I do not know how it was cut, just some clean cuts, a cut that might have been produced by a glass or some other cutting surface. There was not any glass found when I examined the wound and dressed it. The main cut was not with glass, but some other light cuts, I think, were."

Robert S. Burroughs testified that he found a man who was moaning at the place where Mr. Fairall took him and Stanley Williams, who recognized the man as his uncle. "When I found him in company with Mr. Fairall and Stanley Williams, he was on the right of the road going from Mechanicsville to Charlotte Hall, below Mr. Drury's gate, towards Mechanicsville. His body was off the road. * * * We went back the next morning and there was only one puddle of blood where his head was lying." The distances from the state road and the way into Drury's were measured the morning of the trial by Fairall in witness' presence. Witness heard that a car with a broken windshield had passed through the village, found the car, and that it belonged to Matthew Williams, the defendant appellant. "Saw Mr. Matthew Williams and asked him how his windshield got broken and he said that going home that night some one threw a brick or something in his windshield and broke it out. I asked him where it happened and he said up there next to the canning factory, close to Mr. Drury's gate, just above Mr. Drury's gate. So I asked him if he would mind driving up with me and show me the point where it happened. * * * I kept on driving and told him to tell me where to stop and we passed Mr. Drury's gate and we got to a point where there was a lot of glass and he told me to stop; he said that is where it happened. * * * I asked him how can you account for this glass falling all the way back? So he followed me as far back as the glass went, which went back to where Mr. Drury was found. Well, he supposed that must have happened down there and that is where he stopped. * * *We did not find broken glass at the point where I found Mr. Drury's body the night before. We found it the following morning. We followed it along to that point. When Mr. Matthew Williams, the defendant, accompanied me up the road to show me where he thought he had been struck by a brick, at first I went by the point where Mr. Drury's body was found (the witness was driving). I would say twenty-five yards above Mr. Drury's gate there was glass there. Then I followed the glass back and found scattering glass at

the point where Mr. Drury was found." On cross-examination, he said: "There was glass along the road between that and the point opposite where Mr. Drury's body was found. There was no glass off the road where Mr. Drury's body was found. The glass followed on back from where Mr. Williams stopped his car, back about to where Mr. Drury was found, on the right hand side coming up." "I would not like to say just what he told me as to the exact time when he went along there, but what he told me corresponded with around eight o'clock."

Stanley Williams, the first to identify Mr. Drury, who was his uncle, examined the Ford coupé of the appellant at Mechanicsville on January 4th, and said: "I found the windshield was broken out, a little over half of it was broken out, a little piece on the left and the right hand front headlight was bent back. There were two or three little pieces on the right hand side of the car, the glass was sticking in there, there were two or three hairs in there. I could see those hairs very clearly. They were kind of a red like, sandy red like, almost the same color as mine. The blood was on the right hand side of the car where the windshield was broken out, right in the corner of it, two or three little pieces sticking up in the frame of the windshield. I knew Mr. James R. Drury; he was my uncle. His hair was a light color like, sandy color, almost the same color as mine. It was found right on the little piece of glass sticking up in the frame of the windshield."

Burwood Buckler, who lived about a mile and a half north of Mechanicsville, said he and his wife were on the state road leading south from their home in the direction of Mechanicsville, on their way to Mrs. Buckler's mother's, and said: "I came along that road between Drury's lane and Mechanicsville around seven-thirty or quarter of eight * * * going south. I met an automobile between the lane leading into Drury's house and Mechanicsville. I could not say what kind of automobile it was. I met it between Mr. Drury's gate and the turn at Mr. Charley Herbert's where you turn down into Mechanicsville. Before I met that automobile I

met two walkers on the opposite side of the road from where I was. I was going south on the right hand side and they were going north on their right. They were walking on the shoulder of the road, one behind the other. A very short distance after I passed the two men, * * * maybe sixty feet before I met this car after passing those men, those walkers." The witness was here interrupted by the question: "Was there anything about the appearance of those men walking down the road and the approach of the other car that attracted your attention?" to which he answered: "The two men were walking down the road and I was going down on my right and this car was going behind the men and I said to my wife, I said, 'That car is running close on those men.'" An objection to the question was overruled and exception taken, not argued or presented on appeal, and no motion appears in the record to strike out any part of the answer, though it is apparent that the remark to the wife was interrupted. "I met the car just after I met the men, that was around seven-thirty or eight o'clock, somewhere between that. The place where Mr. Drury's body was found has been pointed out roughly but nobody has taken me there and showed me just where he was, but in passing the road they would say that is where he was found. I met the car around about seventy-five yards below Mr. Drury's gate; in fact, I met the walkers first and I met the car I imagine about seventy-five yards south of his gate in the direction of Mechanicsville." He did not know whose car he passed nor the kind of car, and could not tell who the walkers were. Did not remember meeting any other car. The "walkers" walked one behind the other on the shoulder of the road.

Jane Roberta Drury, nineteen-year-old daughter of James Drury, testified: That she was a student at the Mechanicsville High School, was at her home the night her father was injured, and was sitting at a table studying her lessons. The house is "maybe a hundred yards from the state road. I heard a crash and I got up to the window and looked. My cousin was with me. I saw a car out there, and I saw a man get out of the car and go around in front of it and then

come back, I saw a man walking up the road afterwards, I don't know who he was. It looked like a man was walking up the road. The car that I saw stop after the crash was out in front of our house. I could not tell you whether it had gotten below the line of the lane that leads into our house. The night was not so dark. The lights on the car enabled me to see this man get out. As far as I could see, he went in front of his car and then came back and went on up the road (north) towards Hughesville. The car was coming from the direction of Mechanicsville. After I heard the crash I did not jump right up then, but after I heard it a little while, I said to my cousin, somebody must have had an accident, and got up and went to the window and looked and I saw this car out there. I could tell it was a Ford coupé. No other car passed while that car was parked there and a man got out and walked around there." She was then asked to say how her father was dressed. "He had on khaki." "He had on khaki pants when he left home and his overcoat." "They were new ones he had just gotten." When the trousers were removed the night of the accident, they were "cut in back on the leg."

On cross-examination she said: "I could not tell you where that car was in reference to our house, whether it was below the gate or above it, but I know it was not away down below the gate, but it seemed like to me it was above the gate this way but not much, or even with it. * * * I saw this man get out and walk around the car, I did hear him holler once because I had the window up and I only heard, the only voice I heard was once and then when I saw this man walking up the road I thought he was hollering to this man that was walking up the road. I saw him walk around the car and heard him call."

Robert S. Burroughs, recalled, said that Mr. Drury, when he found him, had on khaki trousers, which, when he took them off, were torn in the back, and that he knew they were not torn from the time he picked him up and helped carry him to his home.

Matthew Williams, the appellant, testified: That he worked and lived at Mechanicsville. On the night of January 3rd, 1929, he left Mechanicsville about 7.30 o'clock and went on the state road to the home of his mother, who lived two miles north in the direction of Charlotte Hall. He knew where Drury's gate was located. He was driving a Ford coupé "traveling about twenty miles an hour, not over that, was sure he was not going thirty miles an hour." He said: "I passed a car between the turn and his gate, at least I met a car; I did not pass it. That car was going south toward Mechanicsville. I met it between the turn and Drury's gate. The turn is more than a hundred yards, I guess, below Drury's gate. I have not measured it. Q. After you passed that car did you see anything or was there any obstacle in your way at all? A. No, sir. I did not see anything at all. Q. Did you have an opportunity to see anything after you passed the car? A. Sure; after I passed the car the car had not any more than got by me before the crash came. Q. Just tell the jury what happened. A. Well, I was going up the road, I was going home and just after I met this car the terrible crash came in the windshield. I did not know what it was all about so I stopped as soon as I could and got the glass off me and I got out and looked around and started back down the road; about ten or fifteen feet back of the car I looked around and I called 'Hey.' Nobody answered me and I could not see anything at all, so I went on back and got in the car and went home. I did not know what broke the windshield. Q. Did you have any idea what broke it? A. I thought maybe somebody threw something in there or an owl or something flew against the windshield and broke it. I did not see anything in front of me before the crash." When he called nobody answered. When he arrived at his mother's he examined the car; saw that the windshield was broken. There was nothing else wrong with it. "I did not find any hair or blood or nothing on the car. There was absolutely none. There were two small dents three inches apart in the windshield frame," which were not there before

the accident. The right lamp was slightly tilted before and the evidence was that its position had not changed.

The morning after the accident Squire Burroughs went with the appellant in the latter's car, the one involved, to the scene of the accident, the appellant testifying: "He told me to stop where I thought the crash was and he drove on up the road until I told him to stop, about where I stopped to get the glass out of the car off me. I stopped where I saw some glass. I did not know as a matter of fact just where the crash took place. It was dark at night, I could not tell just where. It was somewhere above his gate. I could not tell where it came. When Mr. Burroughs told me where the body was, I told him the crash came up the road there just above his gate. I thought it was farther up. As a matter of fact, I did not know exactly just where the crash did come." "It could not have been over fifty or sixty feet" beyond the point where he passed a car coming from the other direction until the crash came. "I could see the road plain, there was nothing in the road at all," and that he "overtook nothing"; did not see anything between the passing of the car and the crash; did not see anyone walking in the road; did not see them just before meeting the other car; "did not see them then even." The paved portion of the road, including the two-foot concrete shoulders, was eighteen feet wide, and the road was in the vicinity of the accident.

On cross-examination the appellant said: He had "just passed the (other) car" when the crash came; "the car had just gotten by me. Q. It had just gotten by you? A. Well, it had gone, the rear of the lights had got past me, the car was past me when the crash came. Q. How is that? A. I said the car had passed me when the crash came; the lights of the car had gone, behind me. I could see the road clear enough. Q. When you met this car just before this crash came were you blinded at all by the lights of that car? A. When I met the car, yes. I could see the road plain when I was meeting the car. As soon as I got right to the car of course the lights kind of blind you. Q. When you got right close to the car the lights did blind you? A. Right at the

car. Q. Then you could not detect whether anybody was in front of the car? A. I could see the road."

He was satisfied he could have seen him if there had been anybody in the road. He brushed the glass off the seat at the place he stopped the car and got out. Could not say how far it was back to the point where last glass was found. Mr. Fairall, in presence of Squire Burroughs, measured it at twenty feet south of road into Drury's. The witness said he went about sixty feet from the point of the crash until the car came to a stop. He knew where the lane led into Drury's, but did not know whether the crash came before or after he passed it. Did not blow his horn because "there was nothing to blow the horn at." When the windshield was broken, nothing fell inside the car except broken glass.

Robert Williams, the only witness called by the appellant, corroborated him as to the condition of the car after the accident.

These are the facts upon which the respective parties contend that they are entitled to the decision, given, perhaps, at too great length, but, inasmuch as the evidence is circumstantial, without the testimony of a single eye-witness to the infliction of the injuries to the equitable plaintiffs' decedent, considerable detail is necessary in the statement of the facts in order to show whether there is legally sufficient evidence of the charge of negligence against the appellant as the cause.

As stated in the note to *Neal v. Chicago, R. I. & P. Ry. Co.,* 129 Iowa, 5, 105 N. W. 197, 2 L. R. A. (N. S.) 905: "In an action for the death of one through another's negligence, it is incumbent upon the plaintiff, in the absence of direct evidence, to show the existence of such circumstances as would justify the inference that the injury which caused the death was due to the wrongful act of the defendant, and exclude the idea that it was due to a cause with which the defendant was unconnected, and not leave the question to mere speculation or conjecture." "While, of course," it is not an absolute essential to establish negligence that there should have been an eye-witness to the accident (*United Rwys. v. Cloman,* 107 Md. 688, 69 A. 379), it is necessary

that there be some evidence indicative of negligence in the circumstances surrounding an occurrence, either antecedent to or coincident with the happening of the accident." *Schier v. Wehner,* 116 Md. 553, 555, 82 A. 976, 977. The appellant's contention is that there is no proof of any negligence against him, or that there is no causal connection shown between any act or omission of the appellant and the death of Mr. Drury. That there must be evidence of the defendant's negligence, and the causal connection between such negligence and the injury for which damages are sought, is not, nor can it be, disputed. *Schier v. Wehner, supra; Young Co. v. State,* 117 Md. 247, 83 A. 345; *Anne Arundel County v. Collison,* 122 Md. 91, 89 A. 325. The appellant argues that the verdict of the jury is without foundation in fact, and is the result of conjecture and speculation, and relies upon the decisions in *Benedick v. Potts,* 88 Md. 52, 40 A. 1067; *Balto. & O. R. Co. v. State, use of Black,* 107 Md. 642, 69 A. 439, 72 A. 340; *Schier v. Wehner,* 116 Md. 553, 82 A. 976; *Balto. & O. R. Co. v. State, use of Logsdon,* 101 Md. 359, 61 A. 189; and *Arnold v. Green,* 85 Md. 217, 52 A. 673. The appellant cites and quotes *Balto. & O. R. Co. v. State, use of Savington,* 71 Md. 590, 18 A. 969, but in that case there was not only no evidence of the defendant's negligence, but direct evidence of the deceased's negligence. The rule applicable in all of these cases was that negligence must be affirmatively shown, and that the negligence must be shown to be the proximate cause of the injury, and that, in the absence of proof of negligence and resulting injury, the jury cannot be allowed to find a verdict based on conjecture or speculation. The difficulty was not, nor is it here, with the principles of law to be applied. It is the facts which vary, and the question in each of these case was on the facts, and they are authority and precedents in this case to the extent only to which the facts may be similar, and in this respect are standards with which the facts in the instant case are to be compared.

A few facts in this case are undisputed. James Drury was in Mechanicsville on the evening of January 3rd, 1929,

at 7 o'clock. Some time between 7.30 and 8 o'clock, accompanied by a colored boy, incompetent to testify, he started north on the state road toward his home, less than a half mile away. Between 8 and 8.30 he was found in a dying condition alongside of, and seven feet from, the shoulder of the road, by Wilson Fairall. At or near this point on the road the defendant passed another car which had its headlights on, and it had just gotten by the appellant's car when "a terrible crash came in the windshield." The appellant stopped his car in about sixty feet after the crash, got out of the car, "looked around and started back down the road" "back of the car," "looked around and called 'Hey.'" "Nobody answered"; "could not see anything at all"; "got in his car and went home." The next morning glass was found at a point twenty-five yards beyond Drury's gate, where the appellant said he brushed broken glass off the seat of the car, and from that point the glass was trailed back to a point in the road opposite the place, seven feet off the shoulder of the road, where Drury was found the night before. No glass was seen by any one the night of the accident. The appellant says he left Mechanicsville about 7.30 and went toward the scene of the accident, less than a half mile, at the rate of twenty miles an hour. The man was found between 8 and 8.30. Squire Burroughs said, "what he (appellant) told me corresponded around eight o'clock," but whether it was 7.30 or 8 o'clock, the glass was there when Fairall discovered the body, and when he, with Squire Burroughs and Stanley Williams, returned. From the appellant's·description of the crash, and the distance within which he stopped, the jury might have inferred that the appellant was driving too rapidly by an approaching lighted car at night, and was not, under the circumstances, exercising due care to avoid any one who might be on the road at or immediately after passing.

Mr. Buckler, who lived a mile north of Drury's, with his wife, was going toward Mechanicsville. He "came along that road between Drury's lane and Mechanicsville around 7.30 or 7.45, between 7.30 and 8 o'clock, going south." He met an automobile "between Mr. Drury's gate and the turn

at Mr. Charlie Herbert's, where you turn down into Mechanicsville." Before meeting the automobile, he met "two walkers" who were going north, "walking on the shoulder of the road, one behind the other." "A very short distance * * * maybe sixty feet * * * after passing those men" he met an automobile. He remarked to his wife, "That car is running close on those men." He said, "I met the car around about seventy-five yards below Mr. Drury's gate; in fact, I met the walkers first and I met the car, I imagine it was about seventy-five yards south of his gate in the direction of Mechanicsville." Mr. Buckler said he did not remember meeting any other cars between that point and Mechanicsville. He did not say whether he was walking or driving, but, as he does not remember seeing more than one car in that half mile, he must have been driving the car which the appellant passed. If he had been walking he would have been near enough to have heard the crash and the calling of the appellant. The appellant did not mention any other car than the one he passed just before Jane Drury, daughter of James Drury, heard the crash. She said it was not so dark; the appellant said "it was dark at night." She said she "saw this man get out." The lights on the car enabled her "to see this man get out." As far as she could see, "he went in front of his car and then came back and got in it." The appellant said he "walked around behind the car" and "around even in front of it," but "did not walk in front of it." She said: "I saw a man walking up the road afterwards. I don't know who he was. It looked like a man was walking up the road"; "I did hear him holler once, because I had the window up and I only heard—the only voice I heard was once, and then when I saw this man walking up the road I thought he was hollering to this man that was walking up the road." Mr. Buckler saw "two walkers" going north towards Drury's between 7.30 and 8 o'clock. There were "two walkers" just before he passed the only car he remembered seeing between Drury's and Mechanicsville. Mr. Drury and the colored boy left Mechanicsville together between 7.30 and 8 o'clock. No witness testifies to any other persons having been seen on

that half mile of the road in that half hour. The daughter thought the man who got out of the car was calling to the man who came into view after he called, so that the interval between the cry of "Hey" and his appearance must have been very short. It is no far-fetched inference to believe that James Drury and the colored boy were the "two walkers" and, if they were, in a moment, perhaps in a few seconds, there was only one "walker" left, and that was the boy, whose age and size are not disclosed by the record. The girl thought the man whom she saw was in calling distance of the man who got out of the car; that was the impression on her mind at the time. If it was the boy who left Mechanicsville with her father, his idiocy would account for his failure to respond to the appellant's "Hey."

In addition to the facts just recited, Stanley Williams testified that the next morning he examined appellant's car and found on a piece of glass in the right side of the windshield blood and two or three reddish hairs. The appellant's explanation of the apparent evidence of blood and hair was that the packing around the windshield was a hairy sort of felt, reddish gray in color. He examined the car at night with such light as the headlights produced. In answer to the question, "Did you make any particular examination to detect whether there was hair or blood there?" he said, "I did not have any idea that I had had any accident with any person or anything of that kind." He did not "look for any specks of blood, but * * * looked * * * (his) car over close."

Robert Williams, brother of the appellant, an automobile mechanic, testified that he examined the car the next morning and "found nothing whatever to indicate that it had been in an accident. The windshield was completely broken out, the glass was, and there were two little dents on the lower section of the windshield frame, right over the cowl of the car" (which the appellant said were not there before the accident). Witness also said there was "felt packing between the * * * frame and the glass. * * *" Ordinarily it is a dark gray color. It is, of course, apparent that Stanley Williams was looking for evidence, but he has sworn positively

to a material fact, and the truth of his statement goes to the weight of the evidence and would therefore be for the jury.

The rent in Drury's trousers is some evidence of a blow from the rear. All this, followed by the fact that one man was seen by the daughter to come into view just after the car pulled away from in front of their place, whereas but a short time before "two walkers" were seen by Mr. Buckler, leads to the conclusion that the appellant's car and James Drury were in such close proximity as to time, place, and circumstances that the jury could find, without speculation, conjecture, or guessing, that the appellant's car, while being driven by him, produced the injuries complained of.

Assuming, then, that there was legally sufficient evidence that the deceased was struck by the appellant's automobile, was the injury due to any negligent act of the appellant, and was the deceased at the time acting with due care and caution? It is undisputed that, very shortly before he was injured in a distance not to exceed seventy-five yards, Mr. Drury was walking on the two-foot concrete shoulder of an eighteen foot improved roadway towards his home, where in another minute or two, maybe less, he would have safely arrived. Just before the crash of the appellant's windshield, which left its tell-tale fragments where he was apparently knocked off the road, the appellant passed another car, the lights of which did to some extent obscure his view of the road. He said: "I could see the road plain when I was meeting the car. As soon as I got right to the car of course the lights kind of blind you. Right at the car." Asked, "Then you could not detect whether anybody was in front of the car?" he answered, "I could see the road," but his answer to the next question was that it did blind him "to a certain extent." In this part of his testimony is the rational explanation of the accident, and that is, his vision was obscured, and in failing to slow down so as to have his car under control or to come to a stop. In passing a lighted car at night, a driver almost invariably takes a chance that there are no pedestrians or other obstacles in his way, and it does not require any guessing for a jury to decide whether the appel-

lant took that chance. He said he saw no one in front of him and that "he could see the road." Maybe he could, but, with the night making a black wall on his immediate right and his view in front obscured and his sight blinded by the lights of the approaching car, it can easily be believed that he could not see any one on the edge of the road. It is just the condition which makes night driving dangerous, and on a much-traveled way is a menace of frequent occurrence. Just as "judges cannot denude themselves of that knowledge of the incidents of railway travel which is common to us all" (*Balto. & Yorktown Turnpike Road v. Cason,* 72 Md. 381, 20 A. 113, 114), we cannot sit here oblivious to or in ignorance of the conditions which constantly confront the drivers of vehicles in such general use as automobiles. When the vision of the driver of a car is so obstructed or obscured by the bright lights of a car approaching from the opposite direction that he cannot see any one in the road in front of him, it is the duty of a driver in the exercise of ordinary and reasonable care to increase his diligence to avoid injury to any one who might rightfully be on the road in front of him.

In the case of *Mears v. McElfish,* 139 Md. 81, 114 A. 701, 702, in which the evidence of negligence was direct, though otherwise the facts bear some resemblance to the facts of the instant case, this court, in an opinion by Judge Urner, said of the reciprocal rights and duties of pedestrians and automobilists: "The defendant in his car and the plaintiff on foot were each entitled to the use of the highway. They had reciprocal rights and duties as to its use. Neither could be unmindful of the fact that the road was intended to be available for every legitimate purpose and method of public travel. The driver of the automobile was obliged to anticipate that pedestrians might be using the thoroughfare. It was especially incumbent upon him to exercise reasonable care to avoid injury to travelers who, out of regard to their own safety, would naturally make use of the unpaved margin. The fact that the headlights on the automobile approaching from the city may have made it more difficult for the driver of the defendant's car to see the pedestrians on the side of

the road did not relieve him of the duty to use proper care to observe their presence." The question of the degree of care required of the pedestrian in that case was also defined, but, as that question has not been submitted for decision by the appellant, it is not necessary to discuss it here. The appellant contends that *Mears v. McElfish* has no application because the plaintiff was off the macadam. The facts are that the macadam was fifteen feet in width with an improved space between the macadam and the ditch on which the plaintiff was walking when struck by the defendant's automobile. The criticism of the application of that opinion as an authority here, however, is met by the decision in *Hall v. Albertie*, 140 Md. 673, 681, 118 A. 189, 192, wherein it is said: "All of the witnesses who saw the plaintiff and her husband at the time they were struck by the defendant's car state that they were walking on the dirt path to the right of the macadam; but, assuming that there was evidence tending to show that the plaintiff was walking on the macadamized part of the highway, the question of whether in so doing she was, under the circumstances, guilty of contributory negligence, was clearly a question for the jury to determine." While the question of contributory negligence is not here raised, the appeal being argued on the theory that there is no evidence of the appellant's participation in the injury to Mr. Drury, it is in point as indicating the necessity on the part of the drivers of automobiles to exercise the degree of care and caution required, regardless of the part of the road on which a pedestrian may be.

From the testimony in this case this court is of the opinion that there is legally sufficient evidence of the appellant's negligence as the proximate cause of the injuries to James R. Drury for submission to the jury, and that the action of the trial court in refusing the appellant's prayer for an instructed verdict in his favor should be sustained.

*Judgment affirmed, with costs.*