CHARLES A. MAHAN *v.* STATE, USE OF NORVAL
CARR ET AL.

[No. 9, April Term, 1937.]

374

*Decided April 21st, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*H. Courtenay Jenifer,* with whom were *Jenifer & Jenifer* and *Due & Nickerson* on the brief, for the appellant.

*Frederick Lee Cobourn* and *J. F. H. Gorsuch, Jr.,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

At about 6 o'clock in the evening of September 23rd, 1935, Alvin O. Carr, the infant son of Norval Carr and Agnes Carr, the appellees, while walking from the home of his parents No. 426 Washington Street, in Havre de Grace, Maryland, to the home of a neighbor a few doors away, was struck by an automobile driven along that street by Charles A. Mahan, the appellant, and as a result of the collision suffered injuries which caused his death.

On November 22nd, 1935, his parents brought this action in the Circuit Court for Harford County against Mahan to recover compensation for the loss of the "pecuniary benefits and advantages" which they sustained as a result of his death. The case was removed to the Circuit Court for Baltimore County, where it was tried. The trial resulted in a verdict and judgment for the plaintiffs, and from that judgment this appeal was taken.

The record submits eight exceptions. Of these, two relate to rulings on evidence, the others to rulings in connection with the instructions requested by the parties.

There was in the record evidence tending to prove facts which may be thus stated: Washington Street runs north and south. The driveway for vehicular traffic is twenty-four or five feet wide; of that width the middle part is macadamized, and on either side of the macadam is a dirt shoulder less than five feet wide. The house numbers on the street run from north to south, the even numbers being on the west side. There is a sidewalk on the east side of the street, there is none on the west, so that on that side access to the houses abutting on the street may only be had from the driveway. In front of the houses on that side of the street are little grass plots, through which narrow board walks lead from the houses to the driveway. About fifty feet south of the Carr house, Washington Street intersects Revolution Street running east and west. At the time of the accident an automobile was parked in front of No. 422 Washington Street, partly on the dirt shoulder and partly on the macadam. Because of a wire supported by iron stakes surrounding one of the grass plots between the board walk of No. 426 and No. 420, it was necessary for one proceeding from one of those houses to the other to travel the driveway of the street. Just north of No. 426 there was a tree, which is referred to in the evidence of one witness to identify the location of the parked automobile.

Prior to the accident, Alvin's older brother had been sent to a neighbor living at No. 420 Washington Street to get grass for rabbits which the Carrs kept. At that

time Alvin, who was playing in their yard with a wagon, asked Mrs. Carr, who was sitting on the porch of her home, if he could go with his brother. She told him that he might go, and he then went from the board walk, in front of her house, to the dirt shoulder on the driveway of the street. The parked automobile was between him and No. 420, the home of a Mrs. Gordon. To reach that house it would have been necessary for him to go on the macadam part of the road to pass the parked car, because the left wheels of that car, which was on the west side of the street facing south, were on the edge of the macadam. Before he reached the macadam and while still on the dirt shoulder, an automobile driven by Mahan going south on Washington Street struck and injured him. Mahan's automobile was proceeding slowly, at from eight to ten miles an hour, and the collision occurred at a point about twenty-six feet south of the parked car. In reference to that Mrs. Carr gave this testimony:

"How far do you think it was from the point where he was struck to where the other car was parked? A. I could not judge, it was the width of the other side of the double house I was living in and our alley way there, the board walk, but I didn't measure that. * * * Q. And just as he was about to step upon the macadam in front of that parked car he was struck, is that right? A. Yes, but that car was two houses from my house, he was not close to the parked car, there was a house and yard in between where my boy stepped off my board walk. Q. How far? A. I didn't measure, but 424 and her walk on the side of her house before you come to the parked car. Q. Let me see if I can help you on the distance so we won't have any mistake about that. Now the scale shows from the edge of the wire fence to there, the distance is approximately twenty-six feet, is that about right, your walk to the end of the wire? A. I could not judge it in feet because I never measured it and am not a judge, but I know he had a part of my yard and part of Mr. Pelzer's yard."

In describing the accident she said: "When he stepped

up on the dirt shoulder to go around the car I looked up as Mr. Mahan pulled to our side of the car, and his right bumper struck him and whirled him around three or four times and threw him under the car and he rolled over several times towards the middle of the street and the rear wheel, the back wheel went over the middle part of his body, his arms were laying out and he ran over his arms and body, and at that time I was standing on the board walk trying to get Mr. Mahan to stop and he didn't look over. Whether he heard me or not, I don't know, and as he got over the boy, the boy got up and walked to the edge of the street. Q. On the opposite side? A. Yes, he was in the middle of the street."

He was struck by the extreme right end of the bumper, and when he was struck two wheels of Mahan's automobile were on the dirt shoulder.

After the accident Mahan, in describing the accident to Robert P. Fadely, connected with the police department of the Pennsylvania Railroad Company, said that he did not see the child at all; that he was watching another automobile coming north which at that time was south of Revolution Street. Fadely testified in part as follows: "Did he tell you that this car was coming up the street and he was watching that car to see how it was going to turn and that he didn't see the child until the child ran in front of him? A. He told me he never saw the child. Q. Until the child ran in front of him? A. His attention was attracted by people hollering. Q. He told you he didn't know he hit the child? A. At the time he struck it he didn't. Q. So now he didn't even know he had hit the child? A. Not at the time the child was hit, nor until after he hit the child. Mr. Mahan told how his fender was so high he could not see the child for his fender."

A fact that threw some light on the last statement of the witness was that Mahan is but four feet ten inches in height.

Mahan at the time of the accident was about eighty years old, he had lived in Havre de Grace thirty-four

years and was "familiar with all of the streets in Havre de Grace," and at the time of the accident was driving a taxicab. In describing the accident he said: "I had been out to the station and I was going home and down in the parked cars, on the side of the road where I was going past, just this side where Mr. Carr lived, I pulled out a little in the center of the road to pass it. I saw another car coming up and I was watching it and I looked to the other side and I didn't see any one and I threw my eyes back on the car that was coming up and about that time a little child ran across. I never saw it until it came out from behind my hood on the left hand side and I only saw the top of its head. The child was not over three years old, I guess, something like that, and then as soon as I saw the child I threw my brakes on and stopped as soon as I could." He said that the parked automobile was in front of Mr. Lofton's place (at No. 422 Washington Street), and then gave this testimony: "The fact is, Mr. Mahan, you never did see the Carr child, until after your car struck it? A. I did not. * * * What did you mean when you said 'pulled to the right.' Q. What did you mean by that? A. I had pulled over a little after I passed this parked car. I pulled in to give the car coming up the street plenty of room to pass me. Q. When you were in the act of doing that, was not that the time the Carr child was struck? A.Yes, sir. Q. You had your attention focused on the car that was approaching you in Washington Street? A. I had not a minute and then when I looked at it, the child dropped across ahead of me."

In the course of Mahan's cross-examination, he was asked whether, in an application for a chauffeur's license filed with the Commissioner of Motor Vehicles on March 20, 1934, he had not given his age as sixty-six years. He replied that, while he had not given his age correctly, he did not know what age he had given. He was then shown a certified copy of the application, and asked whether he had not stated in it that he was born in 1867. He said that that statement appeared in the appli-

cation. The certified copy of the application was then "filed" in the case. He was then asked what reason he had for misstating his age, and replied, "No particular reason." That evidence was admitted over the defendants objections, and those rulings are the subject of the second and third exceptions.

The second exception, which refers to the admission of the certified copy of the application, also embraced other rulings and was for that reason objectionable in form. But apart from that criticism the ruling was free from reversible error. Properly and technically, the plaintiff should not have interrupted the defendant in putting on his case by offering evidence on the plaintiff's behalf. The orderly procedure would have been to have made the offer after the defendant had concluded his evidence. Moreover, since Mahan admitted that he had made the misstatement, there was no reason for offering it at all. But since he had made that admission he could not have been injured by the admission of a statement made out of court which was in substance identical with that which he made as a witness.

That it was permissible to ask him on cross-examination whether he had falsely stated his age in the application seems obvious enough. He had testified to his age in chief. The fact that he had been willing to misstate it in order to obtain a chauffeur's license did reflect on his credibility, and was therefore admissible. *Panitz v. Webb,* 149 Md. 75, 80, 81, 130 A. 913; *Jones on Evidence,* secs. 844, 845, 849.

Coming to the rulings on the prayers, the first exception deals with the refusal of a demurrer prayer offered by the defendant at the close of the plaintiff's case. Since the defendant offered evidence on his own behalf following that ruling, he waived his objection to it, and it is not open for review in this court. *Brown v. Hebb,* 167 Md. 535, 175 A. 602; *Pennsylvania R. Co. v. Cecil,* 111 Md. 288, 298, 73 A. 820; *Goodman v. Saperstein,* 115 Md. 678, 683, 81 A. 695; *Knecht v. Mooney,* 118 Md. 583, 589, 85 A. 775; *Doyle v. Gibson,* 119 Md. 36, 39, 85

A. 961; *Casparis Stone Co. v. Boncore,* 121 Md. 449, 450, 88 A. 250; *Delmar v. Venables,* 125 Md. 471, 475, 94 A. 89; *Bernstein v. Merkel,* 126 Md. 454, 457, 95 A. 55; *Balto. Car Wheel Co. v. Clark,* 131 Md. 513, 516, 104 A. 357; *Boggs v. Boggs,* 138 Md. 422, 440, 114 A. 474; *Packard Iron & Metal Co. v. H. P. Pearl & Co.,* 139 Md. 498, 505, 115 A. 761; *Kleiman v. Orion Knitting Mills,* 139 Md. 550, 553, 115 A. 857; *Krymski v. Kupidlowski,* 139 Md. 656, 659, 116 A. 470; *Kremen v. Rubin,* 139 Md. 682, 693, 116 A. 640; *Cohen v. Herbert,* 145 Md. 195, 203, 125 A. 707.

At the conclusion of the whole case the plaintiff offered three prayers, which were granted, and the defendant eleven, of which all were granted except his C prayer and his seventh prayer. The defendant specially excepted to plaintiff's second prayer on the ground that there was in the case no evidence legally sufficient "to show" that the defendant could have avoided the accident after he saw or should have seen that the "plaintiff's decedent" was in the roadway of Washington Street, and he specially excepted to the plaintiff's third prayer, but since that exception was not argued or pressed in this court it need not be considered.

Defendant's C prayer was a demurrer to the evidence, and its refusal the basis of the fourth exception. There was no error in that ruling. It is consistent with the evidence that Alvin Carr was in plain view of the defendant for at least twenty-six feet before the collision, when the automobile was proceeding at the rate of eight miles an hour or about eleven and one-half feet per second. He was therefore in view of the defendant for something more than two seconds. The defendant nevertheless did not see him until after he struck him, and then he proceeded at the same speed until he crossed Revolution Street, a distance of at least one hundred and eighteen feet. If, as he testified, when he first saw the child, "it came out behind" his "hood on the left hand side," it must have been in his view for an even longer period. Because, while the parked automobile may have obscured

his view until he cleared it, if the child had reached the macadam, then the automobile did not obscure his view of it at all. He was familiar with the streets of Havre de Grace and must therefore have known that the only access to the houses on the side of the street where he was driving was from the vehicular driveway, and that persons might come from those houses into the roadway at any time. Due care therefore required him to anticipate that a person might come into the roadway from the Carr home in front of the parked automobile, and the fact that it to some extent obstructed his view required of him a degree of vigilance proportioned to the dangers of that situation. It is also consistent with the evidence that had he exercised that degree of vigilance he would have discovered the child's presence in time to have avoided the collision. The jury were also authorized by the evidence to find that his failure to see the child was due to the facts, first, that he was not looking at the road immediately before him, but at a car in the next block, and, second, that because of his stature the hood of his own automobile prevented him from seeing objects in front of and close to him. It is true that persons of small stature may and do lawfully operate automobiles, but if that condition makes it more difficult for them to discover the presence of children or objects in the highway, it imposes upon them the duty of exercising greater watchfulness to avoid injuring others also in the lawful use of the highway than would be necessary for one of normal stature. The evidence also permits the inference that the child never reached the macadam at all, but was struck while on the dirt shoulder, and that he did not step from in front of the parked automobile in the path of the defendant's car, but that it left the macadam and came onto the dirt shoulder before it struck the child. 5 *American Jurisprudence* 652, 612; *Daughraty v. Tebbets*, 122 Me. 397, 120 A. 354, 34 A. L. R. 1507, note 1513. In the annotation last cited, there is a fair and clear statement of the rule supported by American case law imposed upon the driver of a vehicle

approaching a person engaged about or about to leave or approach a standing automobile. It is there said: "The driver of a vehicle approaching a person engaged about, or standing near, or coming to, or going from, an automobile standing in the highway, owes to such person or persons the duty to exercise reasonable care to avoid injuring them. The question in any particular case as to whether such care has been exercised is dependent upon the facts and circumstances peculiar to each case, and is ordinarily a question of fact for the determination of the jury."

And in 5 *American Jurisprudence* 599, it is said: "It is a general rule of law that an operator of a motor vehicle has no right to assume that the road is clear, but that, under virtually all circumstances and at all times, he must be reasonably vigilant and must anticipate and expect the presence of others. One driving an automobile along a public highway at night is bound to anticipate the presence of pedestrians upon it." *Williams v. State, use of Ellis*, 161 Md. 39, 155 A. 339. Applying those principles to the facts stated, which the prayer concedes to be true, it cannot be said that there was in the case no evidence legally sufficient to permit the plaintiff to recover.

The fifth exception relates to the granting of the plaintiff's first or damage prayer. The prayer was in the usual form, the ruling apparently free from error, and, as that exception was not argued in this court, it will be taken as abandoned.

The plaintiff's second prayer submitted the "last clear chance" doctrine. Defendant excepted to it specially on the ground that there was no evidence legally sufficient to support the application of that doctrine. The court overruled the exception, and that ruling is the subject of the sixth bill of exceptions.

If there was any evidence in the case legally sufficient to support the hypothesis that the infant was negligent, then, for the reason stated in connection with the fourth exception, the exception was properly overruled. But

there was no such evidence. The only person who saw the accident was the child's mother, who said that it was on the dirt shoulder when it was struck. Mahan did not see the child at all until after the collision. The child therefore was where it had an undoubted right to be; it did nothing but walk on that part of the street where, if anywhere, it should have been safe. It is not negligence *per se* for a pedestrian to use a public highway, nor was the child guilty of any conduct which made its use of it negligent. This of course is not a case for the application of the rule requiring pedestrians to cross streets at regular crossings, for here the infant was not crossing the street, nor had it any intention or purpose of doing so. Moreover, this was a rural or suburban rather than an urban street, and the conditions incident to its use resembled those of a rural highway rather than a city street. There was no sidewalk for the use of persons occupying property abutting on the west side of it, so that of necessity they were required to use the vehicular part of the highway for all purposes of ingress and egress to and from their respective properties. In going from No. 426, therefore, to No. 420, both being on the same side of the street, it was necessary to go on that part of it which was also used for vehicular traffic.

The rights of one operating a vehicle and a pedestrian on a public highway are mutual, reciprocal, and equal. Neither may use it in disregard of the right of the other to use it, and each must accommodate his movements to the other's lawful use of it, each must anticipate the other's possible presence, and each must recognize the dangers inherent in the manner in which it may lawfully be used by the other. Highways are for the use of the whole people as avenues of communication, and none are barred by age or physical condition from the use of them, and all who do use them are entitled to expect that others also in the use of them will exercise ordinary care to avoid injury to them. *Panitz v. Webb,* 149 Md. 75, 82, 130 A. 913. There was therefore nothing in the conduct of the child in walking along the dirt shoulder

on the side of the macadam towards a neighbor's house which could even in the case of an adult be characterized as negligence.

The eighth exception relates to the refusal of the defendant's seventh prayer. That prayer, if granted, would have instructed the jury that if the negligence of the child, Alvin Carr, contributed to the happening of the accident, their verdict must be for the defendant, and it gave this definition of "negligence": "the failure to exercise such degree of care as a reasonably prudent person would exercise under such circumstances."

The prayer could have been refused on the ground that there was in the case no evidence legally sufficient to show that the child was guilty of any negligence contributing to the accident. But apart from that it was misleading. The definition of negligence given in the prayer as applied to an infant of the age of the child who was injured was incomplete. It required of the three year old child the same measure and kind of care that would be required of a reasonably prudent adult, but that may not be done. For while in this state a child of tender years may be guilty of negligence (*United Rys. & Elec. Co. v. Carneal,* 110 Md. 211, 232, 72 A. 771), it is not held to the same measure and kind of care that would be required of a normal person of full age (*Washington B. & A. Elec. R. Co. v. State, use of Kolish,* 153 Md. 119, 124, 137 A. 484, 485, *State, use of Kolish v. Washington B. & A. E. R. Co.,* 149 Md. 443, 459, 131 A. 822), but only to that degree of care which should be exercised by one of his age, for, as stated by Judge Sloan in the opinion in *Washington, B. & A. E. R. Co. v. State, etc., supra,* "it could not be required to exercise any higher degree of care than might be expected of one of his years. *United Rys. Co. v. Carneal,* 110 Md. 232, 72 A. 771; *McMahon v. North Cent. R. Co.,* 39 Md. 438; *Balto. & O. R. Co. v. State, use of Fryer,* 30 Md. 51. The great weight of authority is opposed to the proposition that a child a little over four years of age can be guilty of con-

tributory negligence. *State, use of Kolish v. Wash., B. & A. R. Co.,* 149 Md. 459, 131 A. 822."

Finding no reversible error in the rulings presented for review by the appeal, the judgment of the trial court will be affirmed.

*Judgment affirmed, with costs.*