## CHARLES H. RICHARDSON *vs.* THE STATE OF MARYLAND.

*Bigamy—Admissibility of Evidence—Impeaching Witness.*

In a prosecution for bigamy the testimony of the defendant's first wife is admissible to prove the fact of their marriage, under Code, Art. 35, sec. 4, which provides that in all criminal proceedings the husband or wife of the accused party shall be competent to testify.

When the prosecutrix has testified on the trial of an indictment for bigamy that she was married to the defendant at a certain time and place, it is not competent to impeach her credit and her veracity by evidence that before the alleged marriage the witness had lived in concubinage with another man, or with the defendant, or that she had afterwards stolen money from him.

Upon the trial of an indictment for bigamy, evidence that the woman to whom the defendant was married while his former marriage was subsisting knew that he then had a wife living is irrelevant.

Appeal from the Criminal Court of Baltimore City (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*William S. Bansemer* (with whom was *R. B. Tippett* on the brief ), for the appellant.

*William S. Bryan, Jr., Attorney-General,* and *Eugene O'Dunne, Deputy State's Attorney* (with whom was *Albert S. J. Owens, State's Attorney for Baltimore City* on the brief ), for the appellee.

BURKE, J., delivered the opinion of the Court.

The traverser, Charles H. Richardson, was indicted in the Criminal Court of Baltimore for the crime of bigamy. He pleaded not guilty, and was tried by a jury in that Court, and convicted, and was sentenced to be confined in the Maryland

Penitentiary for the period of eighteen months.    From this judgment he appealed.

The indictment contained two counts.    The first count charged that on the 30th day of March, in the year of our Lord, 1898, in the city of Baltimore, the traverser, being then married to and then the husband of a certain woman named Mollie K. Cole, feloniously did then and there marry and take to wife a certain other woman named Carrie E. Seipel, his first wife the said Mollie K. Cole being then alive and still his wife. The second count charged that the traverser on the sixteenth day of November, 1888, in the State of Maryland did marry one Mollie K. Cole, and her the said Mollie K. Cole then and there had for a wife, and that he thereafter on the 13th day of March, 1898, in Baltimore City and State of Maryland, being then and there the husband of the said Mollie K. Cole, feloniously did marry and take to wife a certain other woman named Carrie E. Seipel, his said wife, the said Mollie K. Cole, being then alive and still his wife.    In order to maintain the indictment, it was necessary for the State to prove beyond a reasonable doubt the following facts, first, that the traverser had married Carrie E. Seipel in the city of Baltimore as charged, and second, that another woman to whom he had been lawfully married, towit, Mollie K. Cole, was then living. The jury before whom he elected to be tried was under the Constitution of the State the judges of the law and facts of the case.    It was the duty of the Court to determine all questions as to the admissibility of the evidence offered by the State to support the charge, but the question as to the weight and sufficiency in fact of the evidence to prove the allegations of the indictment was committed by the law to the exclusive judgment of the jury, subject, however to the power of the Court for sufficient reasons to set aside the verdict of guilty.    The record shows that a motion for a new trial was made, and that the motion was overruled.

In proof of the charge contained in the indictment the State produced a witness, Mary Richardson, who testified that she was a resident of Washington, D. C., and that she had been

married to the defendant, Charles H. Richardson, for more than eight years, and that she had a son who was living with the defendant, and who was about seventeen years old. She further testified that she was married to the defendant in the city of Washington. She then testified she had nothing to do with the prosecution of the traverser, and that she had been brought from Washington City as a witness. The State then called Carrie Seipel, the prosecuting witness, who testified that she married the defendant, Charles H. Richardson, in March, 1898, and that she was married at night at the rectory of St. Paul's church on Saratoga street by Rev. Dr. Hodges; that she had never heard of the previous marriage of Richardson until sbout five months prior to the time of testifying; that the defendant had told her that he was a widower, and had showed her an undertaker's bill which he claimed was for burying his first wife. The witness was asked whether she had ever lived at the corner of High and Addison streets with Samuel Shed, to which she replied she had not, and that she had not lived with the defendant at No. 325 North Calvert street before their marriage. Dr. Hodges, rector of St. Paul's Episcopal church, Charles street, testified that he is, and was on March 30th, 1898, a minister of the gospel, and that the records of his church showed that Carrie Seipel and Charles H. Richardson were married by him at the parsonage of said church on March 30th, 1898.

The defendant on his own behalf testified that he was engaged in a patent medicine business at numbers 9 and 11 North Gay street, Baltimore City, in the year 1898; that sometime in March, 1898, the defendant was introduced to the prosecuting witness, Carrie Seipel, by a man by the name of Howard Sloman, who was employed in the business by the defendant, aud that said Carrie Seipel had been hanging around his place for some days before he made her acquaintance. That at the time he is alleged to have married Carrie Seipel, and for some days previous thereto, he had been on a protracted spree, and was unfit for business, and his business was being conducted by Howard Sloman, who collected his

money, paid his bills, and kept his accounts. That a few days prior to the 30th day of March the defendant got on a spree at the room 325 North Calvert street. That on the Tuesday morning preceding the day of the alleged marriage the defendant got on a severe spree of drunkenness, and remembers nothing whatever from that time until the Friday following that Tuesday, when he found himself in the room No. 325 North Calvert street recovering from the effects of a severe drunk. When he came to himself he asked the prosecuting witness, Carrie Seipel, how long he had been in the house, and she said to him you have been here since Tuesday morning. He then asked her if any money had been sent him from the store, and she replied eight dollars. The defendant then said that is strange, because there ought to have been taken in between sixteen and eighteen dollars a day to which Carrie Seipel replied that they had only brought eight dollars. The defendant then said he would go down to the store and see what had happened, and why no more money had been sent him. That he did go to the store, and found that sixty-eight dollars had been sent up to him. He then returned to the room where the Seipel woman was, and told her that she had sixty-eight dollars of his money, and that he wanted it. Whereupon she put her hand under the table cover on a table in the room, and produced a paper which she said was a marriage certificate, and that he had married her on Wednesday following the day on which he had gone on a severe spree, and that he must now support her and take care of her, and if he did not do so she would prosecute him for bigamy, and send him to jail where he belonged. That he knew nothing of the license or marriage. That he told her then and there that she put up the job on him while he was drunk, and that he knew nothing about the marriage, and that she tricked him into it while he was in a drunken condition. That Carrie Seipel replied, "Well, that is the way I do business." That finding himself tricked into the alleged marriage with Carrie Seipel, he packed a large quantity of his medicine, which he shipped to Cumberland, and to Wheeling, West Virginia, and shortly thereafter left the State.

He further testified that he never lived with Carrie Seipel after said marriage, except for a short time, under threats of prosecution, and that he had endeavored for nearly six years to keep out of her way altogether, and refused to live with her or have anything to do with her, and never lived with her for a moment after he had found he had been tricked into the marriage, except for short intervals, when she would hunt him down and threaten him with prosecution. He further proved by Howard Sloman that the traverser for several weeks prior to the date of the alleged marriage had been drinking hard, and witness likewise had been drinking with him, the witness being his manager, and the traverser was entirely unfit for business. That he conducted the business for him, and looked after it during this time. That during the week of the alleged marriage down to and including about the first of April, 1898, the traverser was on a protracted drunk, and was entirely unfit and incapable of transacting any business. In rebuttal, Carrie Seipel testified there was no truth in the traverser's statement that he was drunk when they were married; that he walked all the way to the rectory with her; that he was perfectly sober; that shortly before, a couple of days or so, he said he was going down to get the marriage license; that he returned bringing the license which he said he got himself. The State also introduced the original records of the Common Pleas Court of (application for marriage license), which application was signed "Charles H. Richardson X his mark."

There is an agreement that there shall be set forth in the record a copy of the docket entries, a copy of the indictment, a certified copy of the marriage license between the traverser and Mary Richardson, a certified copy of the marriage license between the traverser and Carrie Seipel, and a certificate of the original record of the Court of Common Pleas showing application of issuing license for the marriage of Carrie Seipel and Charles H. Richardson, and that the foregoing is all the testimony offered in the case. In accordance with this agreement the copies therein mentioned appear in the record, and to the marriage license issued in the District of Columbia for

the marriage of Charles H. Richardson, of Washington, D. C., and Mary V. Cole there is a certificate appended by Rev. Byron Sunderland, minister of First Presbyterian Church, Washington, D. C., wherein he certifies that "by authority of a license of a same tenor as the foregoing, I solemnized the marriage of the parties on the sixth of November, 1888, at Washington, in the District of Columbia."

Upon this evidence the jury convicted the traverser, and their verdict was allowed to stand by the Court below, and it cannot be disturbed by this Court, unless it appears that reversible error was committed by the trial Court either in the admission or exclusion of evidence.    During the course of the trial the defendant reserved nine exceptions to the rulings of the Court upon questions of evidence.    The first exception was taken to the action of the Court in permitting Mary Richardson, who claimed to be the wife of Charles H. Richardson, to testify that she had married the defendant in the city of Washington.    We are not called upon to decide whether the testimony of this witness was as a matter of fact sufficient to sustain the allegation of marriage set forth in the indictment, but the question presented is, was it admissible as tending to prove that she was the wife of the defendant?    Upon this question we have no doubt that the evidence was properly admitted.    She was a competent witness against the accused under *Sec. 4, Art. 35, Code 1904,* although she could not have been compelled to testify.    Upon an issue of marriage, *vel non,* it is always competent for the State to prove the fact of marriege, and the identity of the parties by a witness who was present at the marriage ceremony.    It would appear that the testimony of one of the contracting parties might be accepted as fairly satisfactory evidence tending to prove these facts.

The second, third, fourth, fifth, sixth and seventh excepceptions present substantially the same question, and may be considered together.    The offers of testimony embodied in · these exceptions are:

(1) That before his alleged marriage to Carrie Seipel she had been living with a man named Shed.

(2) That Carrie Seipel had told him she had no money and no friends, and that Samuel Shed with whom she had been living had left her, and that she asked the defendant if he could not help her out, that he agreed to give her a dollar and a-half for the rent of a room.

(3) That he lived with Carrie Seipel at No. 325 North Calvert street.

(4) That Carrie Seipel said as long as he was a married man it was all right, but they would continue to live together.

(5) That Carrie Seipel had stolen $180 from him.

(6) That Carrie Seipel was living with another man before she met the defendant.

The Court committed no error in excluding this testimony. It was obviously an attempt to impeach the credit of the witness, Carrie Seipel, by introducing in evidence an act of dishonesty, and specific acts of unchastity. In 1 *Greenleaf on Evidence* (7 ed.) sec. 461, it is stated "that after a witness has been examined in chief, *his credit may be impeached* in various modes, besides that of exhibiting the improbabilities of a story by a cross-examination. (1) *By disproving the facts* stated by him, by the testimony of other witnesses. (2) By general evidence affecting his credit for veracity. But in *impeaching the credit* of a witness, the examination must be confined to his general reputation, and not be permitted as to particular facts; for every man is supposed to be capable of supporting the one, but it is not likely that he should be prepared to answer the other, without notice, and unless his general character and behavior be in issue, he has no notice." To the same effect is *Taylor on Evidence*, sec. 1470, and *Wharton on Criminal Evidence*, sec. 486. It is also competent under *Article 35, sec. 6, Code, 1904*, to impeach the credit of a witness by proof that he has actually been convicted of an infamous crime. The rule stated by Mr. Greenleaf has been adopted by this Court in the case of *Shartzer* v. *The State*, 63 Md. 149, wherein it is said that: "Evidence in regard to the general character of the prosecutrix for truth and veracity, or for chastity was admissible, but no proof of *specific acts* which

tended to show that she was an immoral person." And in *Brown* v. *The State*, 72 Md. 475, it is said that the character for veracity of a female witness can not as a general rule, it is true, be impeached by evidence as to her character for chastity. The impeachment must go to her general character for truth and veracity. To this rule, however, there is a well recognized exception, in cases for rape, in which the general character of the prosecuting witness for chastity is for obvious reasons always admissible. Not that a rape may not be committed even upon a lewd and dissolute woman, but the fact that she is a lewd woman may have a material bearing upon the question whether the act was committed with, or without her consent." In the light of these principles we think there was no error in excluding from the consideration of the jury the evidence proposed to be offered under the second, third, fourth, fifth, sixth and seventh exceptions.

·The eighth and ninth exceptions relate to the refusal of the Court to allow the traverser to prove that Carrie Seipel knew before his marriage to her, that he was a married man, and had a wife living in Washington. This proffered testimony was wholly immaterial and irrelevant, because the issues presented to the jury did not involve the question as to whether Carrie Seipel knew he had a wife living at the time that he married her, nor did her knowledge of that fact tend in the slighest degree to justify, or palliate his conduct. Finding no error in the rulings of the Court, the judgment will be affirmed.

*Judgment affirmed.*