THOMAS WAYNE COX *v.* STATE OF MARYLAND

[No. 928, September Term, 1981.]

*Decided April 6, 1982.*

The cause was argued before LOWE and WILNER, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired), specially assigned.

*Gary S. Offutt, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Dana M. Levitz, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. LOWE, J., filed a dissenting opinion at page 286 *infra.* WILNER, J., filed a concurring opinion at page 296 *infra.*

## I

Her alleged assailant had been released from prison that day. His assault on the 18 year old girl was barbaric. He forced her to engage in two acts of vaginal sexual intercourse, in sodomy and in fellatio. The duress he employed was a vicious physical beating about her face, head and body, leaving her bowed, bruised, bloody and battered. His excuse to her for his brutal conduct was, "I ain't had a woman in six months." As soon as she was able to drag herself the three blocks to her home, and while still suffering acute physical pain and under the severe emotional stress caused by her experience, she told her mother what had occurred and informed the police of the incident shortly

thereafter upon their prompt response to a call to them. Her assailant was not unknown to her (he was an habitué of the neighborhood), and she identified him as Thomas Wayne Cox. Cox was arrested forthwith at the locale of the crime, which she pointed out on the way to the hospital. The ground at the scene appeared to be "disarranged," and it was there that the police recovered her underpants, which had been stripped from her during the rape, and articles from her pocketbook. At the time of Cox's arrest his clothes were dusty and "had a lot of loose dirt . . . like he just got down and rolled around on the ground." There were grass stains on his jacket at the elbows and on his pants at the knees, and four "newly made" abrasions or scratches on his arm.

Cox was tried before a jury in the Circuit Court for Baltimore County. He was found guilty of rape in the first degree, a sexual offense in the first degree and common law assault. Under the concurrent sentences imposed he is to spend the remainder of his natural life in prison.

## II

At his trial Cox did not dispute the testimonial and physical evidence establishing the corpus delicti of the crimes. He did, however, attempt to cast a reasonable doubt on the proof presented by the State to show that he was the criminal agent. He produced a parade of witnesses to establish an alibi. They placed him in the locality of the scene of the crime before, during and after the time the crimes were alleged to have been committed, but they attempted to account for his activities during the critical period so as to indicate that he could not have been the perpetrator. It is manifest that the jury discounted the testimony of the alibi witnesses, at least to the extent that it found that Cox had the opportunity to and did commit the criminal acts ascribed to him. We note that there was no evidence offered by Cox concerning the fresh scratches on his arm or to explain the condition of his clothing. Nor was there any evidence as to an unworthy motive which may have prompted the victim's designation of Cox as her attacker.

Beyond question, the evidence that went before the jury was legally sufficient for it to find that the crimes charged were committed and that Cox committed them. *See Williams v. State*, 5 Md. App. 450, 452-460, 247 A.2d 731 (1968), *cert. den.* 252 Md. 734 (1969). On appeal, Cox makes no suggestion to the contrary. Rather, he points to five errors that he alleges the court made during the course of the trial, any one of which, he urges, requires reversal.

The first alleged error arose during cross-examination of the victim. Defense counsel elicited that she used to go with one Donald Vrhovac. The defense asked:

> "Did you ever make an allegation, a criminal charge against a Mr. Vrhovac claiming an assault on you?"

The State's objection was sustained. A bench conference ensued. Defense counsel addressed the court:

> "I think I should proffer in this fashion. I have information that the witness made a criminal charge against this Vrhovac of assault on her. And then subsequent during the course of the trial admitted that she did not tell the truth, that it was not an assault on her. And that he was, as a result of her recanting statement, found not guilty."

The State asked how that was relevant, and defense counsel answered, "Credibility." He characterized it as "false testimony that was recanted. . . . She first came into court and said that he did commit an assault, and then on cross-examination the information I have is that she then recanted it." The court thought it was "an independent matter. And if it were more than one, but one isolated instance I don't think it's relevant to this, so I will sustain the objection." The initial question is whether the court erred in sustaining the objection.

It is apparent from the comment and proffer of defense counsel that he was attempting to place the testimony of the adverse witness in its proper setting to impeach her. Impeachment is an attack on credibility, and it once was the

way in which such an attack could be pursued under the common law principle which, for ease of expression, is hereinafter referred to as the "veracity rule." It declared that

> "[a] witness may be impeached by evidence impugning his character or reputation for truth and veracity. Evidence of particular acts or of particular facts, though tending to show untruthfulness, is not admissible for this purpose. But rather, the inquiry should relate to the witness' general reputation for truth and veracity in the community in which he lives at the time of trial." 2 Wharton's *Criminal Evidence,* § 471 (13th ed. 1972) (footnotes omitted).

This was usually done through another witness. Hochheimer, *The Law of Crimes and Criminal Procedure* § 322 (1st ed. 1897). See 2 Wharton, *supra,* § 472. It was long ago well settled in this State that the general rule was "that in order to impeach the credit or veracity of a witness the examination must be confined to his general reputation and not permitted as to particular facts." *Rau v. State,* 133 Md. 613, 616, 105 A. 867 (1919). The rationale of this policy was that evidence of specific acts tends to confuse the issues and unfairly surprise the witness. 3A Wigmore *Evidence* § 979 (Chadbourn rev. 1970). *See Richardson v. State,* 103 Md. 112, 118, 63 A. 317 (1906); *Wise v. Ackerman,* 76 Md. 375, 392, 25 A. 424 (1892).[1]

From the comments of the trial judge in sustaining the objection, it is manifest that he was guided by the common law veracity rule. His reliance on that rule was ill conceived for two reasons. First, clearly the defense was not seeking to impeach the prosecutrix by attempting to establish, pursuant to the veracity rule, that her reputation for truth and veracity, in the community in which she resides, was bad. Second, it seems that the common law veracity rule became defunct in this State upon the passage of ch. 760, Acts 1971,

---

1. For discussions of the rule and its history, see Taylor v. State, 278 Md. 150, 155, 360 A.2d 430 (1976); Comi v. State, 202 Md. 472, 478, 97 A.2d 129, *cert. denied,* 346 U.S. 898 (1953); Berger v. State, 179 Md. 410, 412-413, 20 A.2d 146 (1941).

now § 9-115 of the Courts and Judicial Proceedings Article (Md. Code 1974, 1980 Repl. Vol.), subtitle, "Character witness."[2] Whether the statute served to modify the rule, as the Court of Appeals stated in *Durkin v. State,* 284 Md. 445, 449, 397 A.2d 600 (1979), or to abrogate it, as the Court later said in *Kelley v. State,* 288 Md. 298, 302, 418 A.2d 217 (1980), the declared purpose of the General Assembly as set out in the title to the Act was "to change the prior rule." *Kelley* stated that "[t]he statute permits the admission of a broad range of testimony which may aid the jury in assessing the credibility of a witness. . . ." 288 Md. at 302. In any event, neither the common law veracity rule, whether abrogated or modified, nor the statute, governs the admissibility of the challenged question in the circumstances here.

The rule that in our opinion does govern the admissibility of the challenged question also comes from the common law. It is hereinafter referred to as the "credibility rule." It applies upon cross-examination of the witness sought to be impeached; one of the main functions of cross-examination is "to shed light on the credibility of the direct testimony." McCormick, *Handbook of the Law of Evidence* § 29 (Hornbook Series, 2 ed. 1972). In this context, "the test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or jury in appraising the credibility of the witness and assessing the probative value of the direct testimony." *Id.* The credibility rule is firmly established in Maryland and consistently followed. Characterized as "a fundamental concept in our system of jurisprudence" by the present Chief Judge of the Court of Appeals of Maryland,

---

**2.** The statute provides:

"Where character evidence is otherwise relevant to the proceeding. no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of the State." (Md. Code, 1974, 1980 Repl. Vol.) § 9-115 of the Courts and Judicial Proceedings Article.

then speaking for this Court in *DeLilly v. State,* 11 Md. App. 676, 681, 276 A.2d 417 (1971), it declares:

"A witness generally may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant. Therefore, a witness, whether a party to the action or not, may be cross-examined on such matters and facts as are likely to affect his credibility, test his memory or knowledge, show his relation to the parties or the cause, his bias, or the like."*Smith v. State,* 273 Md. 152, 157, 328 A.2d 274 (1974).

*DeLilly* explicated the rule:

"And cross-examination to impeach, diminish, or impair the credit of a witness is not confined to matters brought out on direct examination; it may include collateral matters not embraced in the direct examination to test credibility and veracity, it being proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character, or credibility." 11 Md. App. at 681.

In *Mulligan v. State,* 18 Md. App. 588, 308 A.2d 418 (1973), we embraced and applied the teachings of 3A Wigmore, *Evidence,* § 983 (Chadbourn rev. 1970). Wigmore quotes from *Territory v. Chavez,* 8 N.M. 528, 532, 45 P. 1107, 1108 (1896):

"[A] clear distinction is to be taken between those matters called for on cross-examination which merely excite prejudice against the witness, or tend to humiliate him or wound his feelings, and those matters, on the other hand, which are calculated, in an important and material respect, to influence the credit to be given to his testimony. As to the latter class, the witness cannot be shielded from disclosing his own character on cross-examination, and for this purpose he may be interrogated upon

specific acts and transactions of his past life; and if they are not too remote in time, and clearly relate to the credit of the witness, in an important and material respect, it would be error to exclude them."

It is patent that "the character of a witness for truthfulness or mendacity is material circumstantial evidence on the question of the truth of particular testimony of the witness." McCormick, *supra,* § 41. This character trait is surely calculated, in an important and material respect, to influence the credit to be given to the witness's testimony. And there is solid authority that particular facts or acts with respect to such matter may be elicited from a witness on cross-examination.[3] Moreover, "[i]t is well settled law in this State that exploratory questions on cross-examination are proper when they are designed to affect a witness' credibility. . . ." *Kruszewski v. Holz,* 265 Md. 434, 440, 290 A.2d 534 (1972). And "[o]f course, the right to cross-examine effectively necessarily includes the right to place the testimony of a witness in its proper setting to fairly enable the jury to judge its credibility." *DeLilly,* 11 Md. App. at 681.[4]

---

3. 3A Wigmore, Evidence, § 981 (Chadbourn rev. 1970) declares that the reasons of confusion of issues and of unfair surprise underlying the prohibition of evidence of particular facts or acts in connection with the rule concerning general reputation for truth and veracity do not operate to forbid extraction of relevant facts of misconduct from the witness himself upon cross-examination.

"(a) There is no danger of confusion of issues, because the matter stops with question and answer; (b) there is no danger of unfair surprise, because the impeached witness is not obliged to be ready with other witnesses to answer the extrinsic testimony of the opponent for there is none to be answered, and because, so far as the witness himself is concerned, he may not unfairly be expected to be ready to know and to answer as to his own deeds." *Id.*

"Thus," concludes *Wigmore,* "neither of the reasons has any application, and hence, so far as they are concerned, the opponent is at liberty to bring out the desired facts by cross-examination and answer of the witness himself to be impeached." *Id.*

4. Cross-examination is, of course, not without limitations. "There may be cases where the subject matter has no relevance at all, not even to impeach the witness's credibility." Smith v. State, 273 Md. 152, 157-158, 328 A.2d 274 (1974). For an example *see* Sloan v. Edwards, 61 Md. 89 (1883). "[E]vidence which is otherwise irrelevant cannot become relevant simply because it is capable of being contradicted, and will thereby impeach the witness." Smith at 158.

This Court applied the credibility rule and recognized the admissibility of evidence as to specific acts in relation thereto in *Mulligan v. State, supra.* The case involved a hearing for the suppression of an oral confession relative to the murder of a child. The issue boiled down to one of choosing between the credibility of a police officer and that of the accused and a witness in his behalf. The defense, on cross-examination of the police officer, attempted to elicit that the officer had been found guilty by the police trial board of falsifying reports of the police department. The Court, deeming that the inquiry sought to be raised by the defense was "crucial" and that the alleged "misconduct" was "relevant to truthfulness," held that the failure to allow the cross-examination constituted reversible error, the judge having abused his discretion. 18 Md. App. at 593-597.

This Court also applied the credibility rule in *DeLilly v. State, supra.* It concerned a prosecution for rape and the contention on appeal was that the trial court committed reversible error when it refused to permit the defense to cross-examine the prosecutrix, her husband and other witnesses with respect to a prior misidentification made by the prosecutrix and her husband of another man charged with and tried for the same offenses. The appellant proffered to show that the husband made an earlier identification of the other accused as one of four criminal agents, but then repudiated it during the course of that accused's trial and as a result the charges were dropped. The court refused to permit the defense to cross-examine the husband on the point. The Court noted that the appellant was convicted mainly on the basis of the positive in-court identification made of him by the victim and her husband and "the believability of their identifications was the key consideration in the case." The Court held that the trial judge had committed prejudicial error in unfairly circumscribing the appellant in his cross-examination. 11 Md. App. at 682.

Although the rule has been cited by the Court of Appeals on a number of occasions, we find no case in the precise factual posture of the one now before us. *Smith v. State, supra,* was concerned primarily with extrinsic evidence of a

collateral matter and with a prior statement inconsistent with the trial testimony of a witness. There is no indication that an exploratory question of the witness on cross-examination to test his credibility was challenged. But implicit in the holding that the extrinsic evidence was admissible for the purpose of impeachment is that the question on cross-examination setting the stage for impeachment was proper. 273 Md. at 156 and 162-163. On appeal of the case to the Court of Special Appeals, it had explicitly so held. *Smith v. State,* 20 Md. App. 254, 257, 315 A.2d 76 (1974). More on point is *Mahan v. State,* 172 Md. 373, 191 A. 575 (1937). It concerned an action for damages incurred by the death of a child struck by an automobile. On cross-examination, the driver of the vehicle was asked if he had falsely stated his age in his application for a driver's license. The Court, with little discussion, said that it "seems obvious enough" that the question was permissible. Noting that the witness had testified to his age in chief, it explained: "The fact that he had been willing to misstate it in order to obtain a chauffeur's license did reflect on his credibility, and was therefore admissible." *Id.* at 380. In *Sappington v. Fairfax,* 135 Md. 186, 108 A. 575 (1919), a witness had testified before a justice of the peace and the grand jury giving evidence which was intended to point to a certain person as having stolen a watch and jewelry. On cross-examination he was asked: " 'When you testified in those prosecutions, both before the justice of the peace and before the Grand Jury, you knew at the time that she hadn't taken it, didn't you?' That was admitted, excepted to, and he answered: 'Yes, sir.' " The Court of Appeals said: "If for no other reason, it was at least admissible for the purpose of reflecting upon his credibility." *Id.* at 192.[5]

---

5. A number of the decisions of the Court of Appeals which refer to the credibility rule turn on the inadmissibility for the purpose of impeachment of extrinsic evidence on a collateral or irrelevant matter. *See,* for example, Harris v. State, 237 Md. 299, 206 A.2d 254 (1965); Howard v. State, 234 Md. 410, 199 A.2d 611 (1964); Kantor v. Ash, 215 Md. 285, 137 A.2d 661 (1958); Panitz v. Webb, 149 Md. 75, 130 A. 913 (1925).

The statement in State v. Giles, 239 Md. 458, 472-473, 212 A.2d 101 (1965), *vac.* 386 U.S. 66 (1967), that "we have held that specific acts of misconduct are not admissible to affect the credibility of a witness, for

    With this background we turn to the question here. It was
apparent from the comment and proffer of defense counsel
that he was attempting to place the testimony of the witness
in its proper setting to test her credibility. The challenged
question, considered in the light of the proffer, had no
relation to the chastity or any sexual misconduct of the wit-
ness. It was not within the ambit of Md. Code (1957, 1976
Repl. Vol., 1981 Cum. Supp.) Art. 27, § 461A (admissibility
in rape cases of evidence relating to victim's chastity). The
question did not tend merely to excite prejudice against the
witness, or to humiliate her or wound her feelings. It was
patently a step in setting the stage for an attempt to influ-
ence the credit to be given to the witness's testimony. The
defense sought inquiry into a matter relevant to
truthfulness. That the witness may have testified in a crim-
inal case, brought on her complaint, that Vrhovac, whom she
admitted knowing, had assaulted her and that she then
recanted that testimony in open court under
cross-examination, would certainly be "likely to affect her
credibility" in the eyes of the jury. The testimony of the
prosecutrix was crucial. It was Cox's position that even
though the victim had been raped, sodomized, forced to per-
form fellatio and beaten, he was not the criminal agent. Her
testimony pointed directly at him, but there were no other
eyewitnesses. Although the condition of his clothes, the
scratches on his arm and his proximity to the scene at the
time of the attack provided some corroboration for her

_____

credibility must ordinarily be attacked by evidence of general reputation for
truth or veracity or material contradictory facts," simply ignores the
credibility rule. And in any event, the statement must now be read in the
light of the character witness statute as construed in Kelley v. State, 288
Md. 298, 302, 418 A.2d 217 (1980).

    Rau v. State, 133 Md. 613, 105 A. 867 (1919), a carnal knowledge case,
was decided under the veracity rule requiring evidence as to general
reputation for truth and veracity, rather than specific acts, in order to
impeach. But the Court noted, at 617: "It will be seen that the prosecuting
witness was not asked on cross-examination whether she had told a lie
concerning the alleged intercourse with [another person] . . . ." In the
context in which the statement was made, the implication is that the Court
thought that such a question would have been proper for the purpose of
impeachment. 3A Wigmore, *Evidence,* § 963, n. 2 (Chadbourn rev. 1970)
states that *Rau* erroneously applied the veracity rule instead of the
credibility rule.

assertion that he was the felon, her testimony was essential. Her identification of him was the key consideration in the case. If the jury did not believe her, there could be no conviction. Cox attempted to sow the seeds of doubt as to his participation in the crimes through his alibi witnesses. But, in light of the evidence adduced, his best, if not only, realistic chance to be acquitted lay in the undermining of her credibility. This he was precluded from doing by the court's ruling.

We are mindful of the general rule so often cited that the allowance or disallowance of questions on cross-examination is normally left to the sound discretion of the trial judge. *Caldwell v. State,* 276 Md. 612, 618, 349 A.2d 623 (1976), and cases therein cited; *Mulligan v. State, supra,* at 593. And we recognize that discretionary rulings by the trial court carry a presumption of validity. *Mathias v. State,* 284 Md. 22, 28, 394 A.2d 292 (1978), *cert. denied,* 441 U.S. 906 (1979). "But where the limitations imposed by the court upon cross-examination are such as plainly inhibit the ability of the accused to obtain a fair trial, the general rule is manifestly inapplicable." *DeLilly v. State, supra,* at 681, citing *Shupe v. State,* 238 Md. 307, 208 A.2d 590 (1965).

Under the case law of this State, the challenged question was proper in the light of defense counsel's explanation of why it was asked. The exclusion of it violated Cox's right to present his defense fully. It follows that the trial court erred in circumscribing the cross-examination.

### III

Having established that the trial court erred, we next consider whether the error may be deemed harmless.

"In modern times, appellate review in all jurisdictions is subject to tenets that a judgment may be affirmed, under certain circumstances, despite errors committed in the conduct of the trial." *Dorsey v. State,* 276 Md. 638, 647, 350 A.2d 665 (1976). If an error was deemed to be "harmless," the judgment need not be set aside. Prior to *Chapman v.*

*California,* 386 U.S. 18, 87 S.Ct. 824 (1967), the Court of Appeals traditionally applied the same test in criminal causes as in civil actions — whether there was a reasonable *probability* that the error may have affected the determination of the case. In other words, "in making an appraisal of the effect of error, the determinative factor . . . [was] whether or not the erroneous ruling, in relation to the totality of the evidence, played a significant role in influencing the rendition of the verdict, to the prejudice of the [accused]." *Dorsey v. State, supra,* at 653. Moreover, the Court of Appeals required that the accused, "as the aggrieved party, establish not only error, but demonstrate as well some resultant substantial harm and prejudice." *Id. Chapman* changed both the burden of proof and the burden of persuasion in criminal proceedings when the error was of constitutional dimension. The Supreme Court held that unless the appellate court could declare a belief beyond a reasonable doubt that there was no reasonable *possibility* that the error might have contributed to the conviction, it could not be deemed harmless. With respect to errors of nonconstitutional magnitude, *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239 (1946), had enunciated a test for harmless error in less stringent terms than that adopted in *Chapman* for an error of constitutional dimension. The Supreme Court in *Chapman* did not purport to override its own authority governing the test applicable to errors not involving the constitution. *Dorsey,* 276 Md. at 662 (Murphy, C.J., specially concurring). But the majority of the Court in *Dorsey* saw "no sound reason for drawing a distinction between the treatment of those errors which are of constitutional dimension and those other evidentiary, or procedural, errors which may have been committed during a trial." *Id.* at 657. The Court concluded, with respect to evidentiary or procedural errors in which the constitution is not implicated, as well as errors of constitutional dimension, that:

> "when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare

a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Id.* at 659.

The Court commanded:

"Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of — whether erroneously admitted or excluded — may have contributed to the rendition of the guilty· verdict." *Id.* ·

*See Ross v. State,* 276 Md. 664, 674, 350 A.2d 680 (1976). Such is the law as it now stands and governs our review of the case before us.

Applying the clear dictates of the harmless error test established in this State, upon our own independent review of the record we cannot declare a belief, beyond a reasonable doubt, that the error here in no way influenced the verdict. The State, as the beneficiary of the erroneous ruling, did not meet its burden of demonstrating the innocuous nature of the transgression. *Hillard v. State,* 286 Md. 145, 155, 406 A.2d 415 (1979). We are unable to be satisfied, in the circumstances, that there is no reasonable possibility that the error may have contributed to the rendition of the guilty verdicts. *See Brafman v. State,* 276 Md. 676, 349 A.2d 632 (1976), in which the Court of Appeals observed in regard to the erroneous admission of hearsay evidence that the possibility that the error in any way influenced the jury to the detriment of the defendant was particularly acute, "when, as [in that case] there is little doubt that a rape took place; the only contested issue being who was the real culprit." *Id.* at 680. Even if the evidence tending to prove Cox's guilt is considered to be overwhelming, it is overwhelming only if the prosecutrix is credible. It may well be that the jury would have believed her despite the admission of the evidence proffered, but that is not subject to speculation on our part. The short of it is that the error here cannot be deemed

harmless, and a reversal is mandated.[6] The judgments of the Circuit Court for Baltimore County are reversed, and the case is remanded for a new trial.

In view of the reversal of the judgments, the other contentions of Cox are not addressed.

*Judgments reversed: case remanded for a new trial; pursuant to Maryland Rule 1082f costs shall not be reallocated.*

---

**6.** The strictures of the harmless error rule are reflected in the decisions of the Court of Appeals. For example, the Court found that the error was not harmless in Ross v. State, 276 Md. 664, 674, 350 A.2d 680 (1976) (improper testimony of prior criminal conduct); Brafman v. State, 276 Md. 676, 680-681, 349 A.2d 632 (1976) (admission of hearsay testimony); Dempsey v. State, 277 Md. 134, 355 A.2d 455 (1976) (improper jury instruction); Crawford v. State, 285 Md. 431, 456, 404 A.2d 244 (1979) (error in placing challenged portions of recordings of interrogations before jury); Hillard v. State, 286 Md. 145, 154-159, 406 A.2d 415 (1979) (receipt of confession in evidence); Green v. State, 286 Md. 692, 696-697, 410 A.2d 234 (1980) (error regarding absence of counsel at a preliminary hearing not harmless even though no evidence or statements from the hearing were introduced at trial); Lansdowne v. State, 287 Md. 232, 247-248, 412 A.2d 88 (1980) (failure to instruct jury on reasonable doubt); Sherman v. State, 288 Md. 636, 640-642, 421 A.2d 80 (1980) (violation of procedural rule that dead counts of indictment not go before jury). Although not discussed explicitly in terms of "harmless error," improper jury instructions were held to be prejudicially erroneous in Squire v. State, 280 Md. 132, 135, 368 A.2d 1019 (1977); McKnight v. State, 280 Md. 604, 615, 375 A.2d 551 (1979). And in State v. Huston, 281 Md. 455, 379 A.2d 1027 (1977), it was held to be prejudicial error not to admit the previous conviction of a witness.

We notice three cases in which error was deemed to be harmless. Each is marked by unusual circumstances. In Taylor v. State, 278 Md. 150, 360 A.2d 430 (1976), the trial court erred in permitting character witnesses to be cross-examined with respect to the defendant's prior convictions with no proof or proffer of the convictions. It was not clear that there had been proper objection. The Court said that even had there been objection, it would have regarded the questions as harmless because the calling of the character witnesses was to establish the defendant's reputation as a "peaceful" man. The witnesses denied knowledge of the convictions, but said that if they had been aware of them their opinion of the defendant's reputation as a "peaceful" man would have remained unchanged. "Thus," the Court concluded, "the State's use of the prior convictions failed to produce the desired result." *Id.* at 158-159.

In Johnson v. State, 283 Md. 196, 388 A.2d 926 (1978), the Court held that a violation of the sequestration of witnesses rule was harmless because it "in no way contributed to the conviction. For the error to have contributed to the conviction, it would have been necessary for [a certain witness] to have been 'taught or prompted' by the testimony which he heard. There is

*Lowe, J., dissenting:*

The English common law tradition of "cross-examination to credit" permitted counsel to inquire into particular acts of a witness's misconduct, though it had not been the basis for conviction of a crime. In England, the courts trusted the disciplined discretion of the bar to avoid abuses. In this country there is a confusing variety of decisions, and ironically, even in Maryland that confusion exists.

Many of the courts in this country permit acts of misconduct to be used to impeach whether convictions ensued or not. A substantial number of courts prohibit altogether cross-examination as to acts of misconduct for impeachment purposes because of the dangers otherwise of prejudice (especially if the witness is a party), of distraction and confusion, and of abuse by the asking of unfounded questions.

Although the latter view is "arguably the fairest and most expedient practice", C. McCormick, *Evidence* (2nd ed.) at 82-83, Maryland appears to fall in a third category which recognizes that cross-examination concerning acts of misconduct is subject to a discretionary control by the trial judge. Perhaps preoccupied with its newly identified "credibility rule", the majority appears to have overlooked this traditional but limited discretion which, when abused, affronts the constitutional right of confrontation. Before addressing my specific differences with the majority, therefore, I should point out a generally recognized basic beginning point — since the majority did not — that a judicial infringement upon a defendant's right of cross-examination addressed to a witness's credibility is error of constitutional magnitude, and expressly so since *Davis v. Alaska,* 415 U.S. 308 (1974). If such error exists, it

---

no way in which that prior testimony could have been helpful to [that witness] in his testimony." *Id.* at 203.

In Robeson v. State, 285 Md. 498, 403 A.2d 1221, *cert. denied,* 444 U.S. 1021 (1979), admission of testimony concerning pre-arrest silence was held to be harmless where the witness later gave testimony, without objection, to the same effect as earlier testimony to which an objection was erroneously overruled. *Id.* 504-507.

can hardly be harmless, but whether it exists depends upon the exercise of judicial discretion in limiting it. The discretionary right to interfere in such an inquiry in a criminal case is only permitted as to degree, purpose and relevance. Trial judges must decide when an interrogation has become repetitive or harassing, *id.* at 316; and beyond that, the scope of cross-examination may be limited only if it is irrelevant.

Having disregarded the constitutional ramifications (perhaps as unnecessary in light of its result), the majority's brushing aside the discretionary responsibility of the judge to decide the relevance of the proffer was effected by quoting a Pickwickian platitude from *Smith v. State*, 273 Md. 152, 157 (1974), that a "witness's credibility is always relevant." It then underscored the *Smith* sophism by declaring an equally unaffecting piety —

"The defense sought inquiry into a matter relevant to truthfulness."

If that banality is to be the test of the scope of cross-examination to test credibility, the majority will have effected what I have discerned as its implication, that there is no exclusionary discretion left to a trial judge in the sphere of cross-examination. The "credibility rule", newly identified by the majority, is a poor substitute offered for the faith that the English reposed in its bar and that we once reposed in our trial bench, *i.e.,* to discern in context those fact-bound questions of relevance so remote to us when viewed on a printed page. The majority's newly named but unexplained "credibility rule" appears to return to the old English tradition from which our system had evolved — where only the lawyer can restrict the scope of his credibility examination of a witness. Yet, if discretion is to be exercised, it should remain with the trial judge rather than a biased advocate, since where such discretion is necessary, the questions of relevance will obviously be close ones requiring a delicate balance. After this case, however, the judge may not interfere as long as the inquiry relates in some way to the witness's past acts of veracity without regard to whether the

acts relate to the issue litigated and in controversy through that witness.

I cannot accept either that interpretation of the law, or our right to change that which precedent has established here as the law. In the past, we have frequently said that unless the proferred probe is unquestionably relevant, we cannot call it an "abuse" simply to substitute our own judgment. Were we permitted to do that, I concede that here the wiser part of discretion, and a better practice, would have been to have demanded a more detailed proffer, in camera, and then err, if at all, on the side of prudence. But the proffer here, to which appellant is limited, did not point to an act of misconduct pertaining to any motive or bias of the witness, nor was it relevant to the issue within the range of the litigated controversy.

Bearing in mind that the accused conceded the corpus delicti of the crime, the sole issue litigated or in controversy was his criminal agency, *i.e.*, the victim's identification of him as the perpetrator. That is not what the proffer sought to impeach. The proffer, if true, disclosed that the witness had admitted that an alleged assault upon her was not an assault at all.

> "MR. KAHN: ... I think I should proffer in this fashion, I have information that the witness made a criminal charge against this Vrhovac of assault on her. And then subsequent, during the course of the trial admitted that she did not tell the truth, that it was not an assault on her. And that he was, as a result of her recanting her statement, found not guilty."

This collateral proffer may have attacked her credibility regarding what constituted the elements of an assault (corpus delicti), but not upon the issue in controversy, which was the identification of the perpetrator (criminal agency).

We can certainly assume that Judge Brizendine sensed some lack of relevance between the attestation of the witness and the inquisition directed at her, although he did not

detail his explanation. Unlike the Puritans who judged Hester Prynne, the judge's expression indicated rather that he did not adhere to a belief that one is marked for life by a single indiscretion. He implied that multiple instances, presumably even if collateral and irrelevant, may indicate a propensity for untruthfulness, but that a single irrelevant incident may lead to such time-consuming and distracting explanations that even the uncontested corpus delicti issue may be obscured when the only controversy is identification. In short, he weighed the probative value against the danger of misdirection and said:

> "I think it's an independent matter. And if it were more than one, but one isolated instance, I don't think it's relevant to this, so I will sustain the objection."

That is precisely the discretionary exercise that the Court of Appeals permitted the trial judge in *Caldwell v. State,* 276 Md. 612 (1976), which the majority cited but did not explicate, explain or try to distinguish. In that double-rape case, the trial judge had ruled that defense counsel could *not* question the prosecuting witnesses with regard to their accusations of rape against two other men, alleged to have occurred contemporaneously with the attacks at issue in that case. The Court's limited discussion there points up that the sole issue on appeal is not whether we believe the inquiry to have been relevant or irrelevant, but whether there was a cognizable question regarding relevance. If there was *any question,* the trial judge's discretion was not abused, however he ruled. The Court of Appeals was not persuaded that the trial judge had abused his discretion in *Caldwell, supra* at 618, just as I am not in this case.

They rely instead on two criminal cases from our Court, *DeLilly v. State,* 11 Md. App. 676 (1974), and *Mulligan v. State,* 18 Md. App. 588 (1973), and two civil cases in the Court of Appeals, *Mahan v. State,* 172 Md. 373 (1937), and *Sappington v. Fairfax,* 135 Md. 186 (1919). In both *DeLilly* and *Mulligan,* there was a clear unequivocal and weighty relevance between the issue asked for impeachment

purposes and the issue in controversy through the witness's testimony, *i.e.,* between the attestation and the inquisition. In *DeLilly,* the issue attested by the witness was, as it is here, the identification of the accused; the issue under inquiry was a clearly relevant prior misidentification of an accused in the same occurrence. In *Mulligan,* the issue attested by the police officer-witness was the truthfulness of his report which contained a recitation of appellant's disputed statement; the issue under inquiry was the officer's truthfulness of past reporting. Each case has an obvious relevance between the attestation and the inquisition, and we properly held that such relevant credibility issues were improperly proscribed.

It is significant that the civil cases relied on by the majority both dealt with questionably relevant issues that *had* been admitted regarding a witness's credibility. In cursorily affirming those cases, the Court of Appeals said simply that it was not error to have admitted testimony of unrelated mendacity. That does not mean that to have precluded the questions and answers would have been error. To the contrary, it supported the trial judge's exercise of discretion as I would in the case before us. Nor would it have been improper to have admitted the inquiry in the case before us, although it may have been imprudent to permit this surprise red herring diversion and confusion of issues before the jury, considerations which appear to weigh heavily in the discretionary balancing. See *Smith, supra* at 162.

Because I so firmly believe that to hobble cross-examination improperly interferes with the constitutional right of confrontation, I need hardly address the majority's harmless error apologia. I do not believe that an improper interference with the right to test a witness's credibility could be harmless. It is perhaps for that reason that this issue has been treated traditionally as a discretionary exercise rather than an evidentiary rule of right or wrong. If a judge's discretion in this case is abused, it necessarily means that he has crossed the demarcation of his discretionary authority and the error is of constitutional

dimension. But if he has not crossed that line of discretionary responsibility, we cannot interfere.

In weighing the probative value of the collateral disclosure, the judge must review it in perspective, *i.e.,* within the range of the litigated controversy and the evidence elicited. Does the fact that a witness had once charged a boyfriend with a crime confuse or clarify her identification of the appellant as the perpetrator of a crime which indisputably had been committed upon her? To review his discretionary exercise, we, too, must try to gain some similar perspective of the trial setting from our cold record. To do that we should have a far better picture of what transpired at trial vis-a-vis the identification of appellant, than has been afforded us by the majority. We will need at least as much factual detail as if we were reviewing for harmless error.

> "The determination of whether there has been an abuse of discretion necessarily requires consideration of the particular circumstances bearing upon each individual case. Clearly, the absolute preclusion of cross-examination pertaining to a witness's motive for testifying would be an abuse of discretion, but beyond that we must look to such factors as the scope of interrogation permitted, how relevant the particular inquiry is to bias or motive, and whether the defendant has been prejudiced by the court's ruling." *Fletcher v. State,* 50 Md. App. 349, 357 (1981).

A clearer depiction of the scenario from the trial record revealed that the identification evidence was not only clear and convincing — beyond a reasonable doubt — but was supported by circumstantial and physical corroboration, as well as numerous tests of reliability that we have applied in other cases. The evidence in the record as revealed to the court and jury was as follows:

On the evening of 30 September 1980 a mother was awaiting the arrival home of her 18-year-old daughter. The mother was uneasy because the daughter had said she would

be home about 9:00 o'clock and that time had passed. The mother's anxiety proved to be well-founded. About 10:30 she saw her daughter, bent over at the waist, walking with difficulty toward the house. The daughter was battered, bloody and bruised. She called out to her mother and kept exclaiming, "I have been beaten, I have been raped." As put by the police officer, who talked to her upon responding to the call reporting the crime, she "indicated" that her assailant had forced her to "vaginally, anally, and orally copulate [him]." Her physical appearance, injuries and emotional state graphically bore out her allegations. Her mother described her daughter's appearance: "[H]er head was about as big as a basketball . . . it was so swelled out. And her eye, the one eye was closed, and the other was half open." The police officer depicted her injuries: "Mass contusions and bruises on her throat and neck area. Face was badly battered, left side of the face was extremely swollen. The left eye was swollen shut. And all the blood vessels were broken in the right eye. I couldn't observe the left eye because it was swollen shut." An examination by a medical doctor disclosed that "she had . . . a bit of swelling of her left eye and left orbital region. She had some swelling of her neck and face with multiple bruises. . . . She had a bloody discharge coming from her ears . . . she had bruises on her left arm." There was an abrasion type or puncture wound on one of her fingers. There was tenderness of the vulva area (vaginal) and of the peritoneum (the area lateral to and beyond the vagina). Her injuries were so severe that the gynecologist who examined her referred her to the general surgeon at the hospital and to an eye, ear and nose specialist.

When the daughter had arrived home after her travail she was "sobbing and crying hard." Even at the time the officer talked to her she was "breathing hard" and "sobbing and crying." On the way to the hospital, she pointed out where the assault had taken place. At the scene the police recovered the underpants which had been stripped from her during the rape, numerous coins and a book of matches. The ground appeared to be "disarranged."

The assailant was identified by the victim as Thomas

Wayne Cox. She recognized him from having "known him" in the neighborhood, and she promptly gave his name to her mother and to the police at a time when it was inconceivable that she would fabricate her known assailant. He was forthwith apprehended in a house on the property where the attack had occurred. When he was taken into custody, his clothes, in the words of the arresting officer, were "very dirty, very dusty, had a lot of loose dirt, his dungaree jacket and his blue jeans . . . . [I]t's like he just got down and rolled around on the ground. . . . [H]e had some grass stains also on his elbows of his jacket and the knees of his pants." There were four "newly made" abrasions or scratches on his arm. He had been released from the Maryland Correctional Institution in Hagerstown the day the attack took place.

At the trial the victim recounted the details of her ordeal. She had left her girlfriend's house about 9:05 p.m. to walk the three blocks to her home. She saw Cox and remarked: "I thought you were supposed to be in jail." He replied that he had just been released earlier that day. He asked her for a hug, and she refused.

> "And then he pushed me to the ground and started strangling me and beating me in the face. And he just kept beating me. And he gave me a hard blow to my left ear and I passed out. Then when I awoke I was moved further to the side of the house. And I noticed that my pants and my underwear were gone, and his pants were down. And he was having vaginal intercourse and still beating me in the face. And he just kept beating me. And then he gave me a hard blow again to the same left ear and I passed out. And then the second time when I awoke he was trying to pull my right eye out . . . actually trying to pull it out. . . . By grabbing the eyeball itself. . . .
>
> And then I put my hands up towards his face to try to, you know, give — get him to stop. And that's when he bit me in my wrist and my finger. He bit down really hard. And I still don't have too much feeling in that finger. . . . Then after he beat me he

> kept the beating up. And he started anal sex. . . .
> First he put four fingers up anally, then put his
> penis anally. And I kept telling him to stop. I said
> it hurt. And he said, it doesn't. And then he kept,
> you know, beating me, and my eye was starting to
> close up. And then he got up and stayed on top of me
> and put his penis in my mouth."

He had vaginal intercourse with her a second time. He then pulled up his pants and began to walk toward the end of the yard. He excused his actions by telling her, "Sorry I had to do this but I ain't had a woman in six months." The victim was so weak she had "to pull herself up by the fence." She was unable to find her underpants, but put on her slacks and located her purse. Her ribs were "very bruised" and her legs were like "rubberbands." Because of the beating she had to walk very slowly and in a bent over position. She went directly home and told her mother what had happened. The police and an ambulance arrived shortly thereafter and she was taken to the hospital.

At his trial Cox did not dispute the overwhelming testimonial and physical evidence establishing the corpus delicti of the crimes. He did, however, attempt to cast a reasonable doubt on the proof presented by the State to show that he was the criminal agent. He produced a parade of witnesses to establish an alibi. They placed him in the locality of the scene of the crime before, during and after the time the crimes were alleged to have been committed, but they attempted to account for his activities during the critical period so as to indicate that he could not have been the perpetrator. There was no evidence offered by Cox concerning the fresh scratches on his arm or to explain the condition of his clothing.

From that review we can see, in addition to the physical evidence — the dirt and dust all over appellant's clothes, his elbows and knees grass stained, the unexplained scratches on his arms and the fact of his apprehension practically on the situs of the crime — that his own "alibi" witnesses placed him at the situs of the crime with both time and opportunity

available to have committed it. That the appellant may have been already sexually satisfied is, as an alibi, all but incredible. One of the activities Cox engaged in was with an admitted homosexual who lived across the street from Cox, who testified that on the day in question Cox came to his house about 8:00 p.m., and he performed a homosexual act on Cox. Cox left about 9:00 p.m. and sat on the porch of the house across the street. This was the same house in which Cox was arrested a short time later.

There is the further reliability as indicated in *Moore v. State,* 26 Md. App. 556, 562-567 (1975),[1] of a young girl in excruciating pain immediately following an attack and while still emotionally engulfed in the situation, relating to her mother the name of her attacker. The chance of misidentification was minimized because she knew the appellant from the neighborhood and his corroborated disclosure to her of his prior prison incarceration is itself admissible as further proof of identity. See *Mollar v. State,* 25 Md. App. 291 (1975).

With such overwhelming reliable corroboration of the positive in-court identification by the victim, it is inconceivable that because the victim may have once born, and subsequently recanted, an improper charge against a boyfriend, she would be lying or mistaken now in the identification of her assailant. It is equally inconceivable that any *reasonable* person would have been affected by the disclosure that she once had admitted that an assault was not an assault (which I will here assume to have been true) and raised therefrom a *reasonable* doubt of appellant's criminal agency in this case. If that is so, the trial judge did not err, even if we find that the inquiry was relevant beyond question, thus depriving the judge of his discretionary exercise. *Dorsey v. State,* 276 Md. 638 (1976).

I regret that the majority does not address what it

---

1. In Moore v. State, 26 Md. App. 556 (1975), we held that reliability of an excited utterance overcame the hearsay impediment when a youngster in pain told his doctor who caused the injury, "Daddy did it". That same reliability adheres to a young girl concededly badly beaten and raped and ravished who immediately identifies her attacker to her mother.

recognizes as an interference with cross-examination as an issue of constitutional magnitude. I regret further that they have so little faith in a trial judge that they assume from a cold record on a fact-bound issue to improve on his judgment by substituting their own, when the limitation on cross-examination has clearly done no substantial harm to the defense, even if it had been an issue of error rather than an exercise of discretion.

But it was not error; it was a proper exercise of discretion to avoid distraction and confusion by the jurors. Where is there a single case cited or citable by the majority holding that a victim's past may be scoured for a single suggestio falsi, however irrelevant, which may then be used to becloud the issue before the factfinder? There was no case for the majority to cite permitting such collateral excursions into a victim's past.

There is now.

*Wilner, J., concurring:*

This case is a troubling one. There is no doubt that the 18-year old victim was brutally raped and beaten, and the evidence presented to the jury more than sufficed to show that appellant Cox was the guilty party. I am well aware, as is Judge Orth, that the effect of the Court's decision today is to require that the victim again come into court and endure the trauma and humiliation of reliving and retelling the unconscionable horrors committed upon her. This is something that all of us are sensitive to and earnestly wish could be avoided.

The issue before us, however, is not whether Cox *should have* been convicted, but whether he was *properly* convicted. Neither the heinous nature of the crime nor the probability that Cox committed it may detract us from our primal responsibility for assuring that the fundamental precepts of due process of law were observed in this case. At issue here, in the context of the court's refusal to permit a line of inquiry on cross-examination, is the Constitutional right (State and Federal) of all accused persons to confront the witnesses against them. *See Davis v. Alaska,* 415 U.S. 308 (1974);

*Gregory v. State,* 40 Md.App. 297 (1978). It is a right that transcends the nature of a particular case; it must be protected in every case.

As Judge Orth has pointed out, notwithstanding the abundance of corroborating physical and circumstantial evidence, the basic issue at trial came down to one of credibility, whether to believe the victim's accusation that Cox was her assailant or his assertion that he was not. If the jury were to find the victim to be a credible and truthful witness, it would quite naturally tend to believe what she said, and thus to doubt, or to disbelieve, the contrary assertions of Cox. That is obviously what happened. But if, on the other hand, the jury had some reason to doubt the credibility of the victim — to question whether her accusation of Cox was a truthful one — the counterbalance to the credibility of Cox's defense would have been weakened, and the jury may then have regarded that defense more favorably. In that event, it may well have entertained a reasonable doubt as to Cox's guilt, and thus acquitted him. Aside from the bestial nature of the assaults committed here, this, perhaps, is the one point of agreement among the panel; if the trial court erred in refusing to allow the cross-examination sought by defense counsel, the error was not harmless beyond a reasonable doubt.

Judge Orth views the issue as being one of error or non-error. Judge Lowe, in dissent, sees the allowance of cross-examination as to credibility not as a "yes-no" matter, the trial judge being either right or wrong, but rather as a matter that permits of some discretion, and urges that his exercise of that discretion ought not to be overturned unless it amounts to an abuse.

It seems to me that the law is this. The cases cited by Judge Orth — *DeLilly* and the others — make clear that, in general, cross-examination designed to test or attack a witness's credibility is always relevant and must be allowed. It is not a matter of discretion. A judge simply cannot shut off an inquiry through cross-examination which, if successful, would tend "to impair the credit of a witness"; *DeLilly,* 11 Md.App. at 681; and if he does so, whether in a purported

exercise of discretion or simply by misunderstanding the law, a resulting conviction will, unless the error is harmless, be reversed.

There are, however, two areas in which the trial judge may have some discretion. The first is in deciding whether the information sought to be elicited really is relevant to credibility, whether, in other words, it *would* tend to impair the credit of the witness; and the second is in deciding whether the particular question posed is a proper one. We are concerned here with the first of these.

Although I agree that the trial judge has *some* discretion in determining whether a particular line of inquiry is relevant to credibility, it is, under the cases, a rather limited discretion. Thus, if, as here, a judge refuses to permit a certain line of cross-examination on the ground that, in his judgment, it is not relevant to credibility *and he is wrong,* whether we regard the mistake as direct error or as an abuse of discretion is of importance only to legal theorists and commentators. The effect, and the required remedy, is the same.

I am convinced, from the authorities cited by Judge Orth, that the line of inquiry sought by defense counsel *was* relevant to credibility. We are not dealing here, as Judge Lowe suggests, with past "bad acts" not amounting to convictions, and we are certainly not dealing with issues of the victim's chastity, reputation, or moral character.

Assuming, for purposes of this appeal, that counsel would have been able to confirm his proffer through cross-examination of the victim, the simple question is this: would it be relevant for the trier of fact, in deciding whether to believe the victim's accusation of Cox, to know that she had once before caused another man to be criminally charged with assault, that she had repeated that accusation under oath at the man's trial, and that *on cross-examination* she had recanted, thus at least tacitly admitting that (1) she had falsely accused the man, and (2) she had lied under oath?

There is no reasonable way that question can be answered in the negative. That is why the conviction must be reversed.